**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq.
One Gateway Center, Suite 2600
Newark, NJ 07102
Telephone: (973) 313-1887
Facsimile: (973) 833-0399
Email: lrosen@rosenlegal.com

[additional counsel on signature page]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| PATRICIA THIEFFRY, Derivatively and on Behalf of SYNCHRONOSS TECHNOLOGIES, INC., <br><br> Plaintiff, <br><br> v. <br><br> KAREN L. ROSENBERGER, STEPHEN G. WALDIS, WILLIAM J. CADOGAN, THOMAS J. HOPKINS, JAMES M. MCCORMICK, DONNIE M. MOORE, RONALD W. HOVSEPIAN, JOHN W. FREDERICK, KRISTIN S. RINNE, MOHAN GYANI, FRANK BAKER, PETER BERGER, ROBERT AQUILINA, GLENN LURIE, ROBERT E. GARCIA, LAWRENCE IRVING, AND LAURIE HARRIS, <br><br> Defendants, <br><br> and <br><br> SYNCHRONOSS TECHNOLOGIES, INC., <br><br> Nominal Defendant. | Civil Action No. _____ <br><br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Patricia Thieffry ("Plaintiff"), by her undersigned attorneys, derivatively and on behalf of Nominal Defendant Synchronoss Technologies, Inc. ("Synchronoss" or the "Company"), files this Verified Shareholder Derivative Complaint against Defendants Karen L. Rosenberger, Stephen G. Waldis, William J. Cadogan, Thomas J. Hopkins, James M. McCormick, Donnie M. Moore, Ronald W. Hovsepian, John W. Frederick, Kristin S. Rinne, Mohan Gyani, Frank Baker, Peter Berger, Robert Aquilina, Glenn Lurie, Robert E. Garcia, Lawrence Irving, and Laurie Harris (collectively, the "Individual Defendants") for breaches of their fiduciary duties as directors and/or officers of Synchronoss, unjust enrichment, waste of corporate assets, abuse of control, and gross mismanagement, and violations of Sections 14(a), 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for her complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to herself and her own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through her attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Synchronoss, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by Synchronoss' directors and officers.

2.      Synchronoss purportedly provides mobile solutions for Service Providers and Enterprise through scalable software solutions and platforms. The Company claims it simplifies the creation and management of customer and employee experiences associated with identity, cloud, messaging, applied analytics, and secure mobility.

3.      Synchronous provides "Activation" and "Cloud" services to commercial mobile carriers.

4.      Activation Services was the focus of the Company's business from its inception through 2013. AT&T was the Company's largest source of revenue for that service during the 2007 to 2012 period, when AT&T had exclusive rights to distribute iPhones. Beginning in 2013, however, Synchronoss began to pivot away from its Activation Services businesses and rebrand itself as a consumer and enterprise cloud service provider. Thereafter, the Cloud Services segment appeared to grow rapidly in 2013 and 2014 and by 2015 its reported revenue surpassed that generated from Synchronoss' Activation Services.

5.      In 2014, Synchronoss altered the mix of metrics determining executive compensation such that the Cloud Services business would account for a substantial component of executive compensation. Thus, Company management became highly incentivized to ensure that the Company broadcast high revenue growth in Cloud Services.

6.      Following the change in executive compensation, the Company announced record-breaking growth in Cloud Services in the quarter ended September 30, 2014, reported revenue for Cloud Services that appeared to surpass that for Activation Services in 2015, and subsequently made it apparent that Cloud Services would continue to grow through 2016. Cloud

Services increased from 46% of the Company's reported revenues in 2014 to 67% of its reported revenues in 2016.

7.     Throughout the Relevant Period (defined below), Synchronoss failed to abide by accounting procedures and improperly recognized revenue. The Company also manipulated financial figures to make the financial statements appear more attractive and improve margins.

8.     In late 2015, Synchronoss booked revenues of $7 million in connection with two AT&T purchase transactions for which there is no evidence. In the first quarter of 2016, the Company recognized $5 million in licensing revenue from an agreement with Verizon that had not yet been signed so that the Company could show continued revenue growth in Cloud Services.

9.     On September 2, 2016, the SEC sent the Company a comment letter the ("SEC Letter"), asking, *inter alia,* that Synchronoss "provide a narrative summary of the significant terms of any material agreements with either" AT&T or Verizon. Synchronoss refused to provide the SEC information on such contracts, despite the SEC's repeated requests.

10.     Following the announcements of transactions recorded with AT&T for $7 million and with Verizon for $5 million, although either they never happened or happened at a later date, during an earnings call held on November 7, 2016, Defendant Waldis announced that a $25 million license deal related to Cloud Services had been signed with Verizon. The Company, under Defendant Rosenberger's direction, prematurely recognized the $25 million received as lump-sum revenue as opposed to ratably as required by U.S. Generally Accepted Accounting Principles ("GAAP"), thus inflating its Cloud Services financials

11.     While Cloud Services growth appeared to continue to expand based on Company reporting, Activation Services were reported as generating declining or flat growth throughout 2016. Against these reported financials, in late 2016, the Individual Defendants caused Synchronoss to engage in two simultaneous transactions that fundamentally transformed the Company.

12.     On November 7, 2016, the Company announced that, in an effort to enhance shareholder value, it was evaluating strategic alternatives for its activation business, which provides activation services for mobile operators.

13.     On December 6, 2016, the Company announced that it was divesting 70% of its carrier activation business to Sequential Technology International, LLC ("Sequential") for $146 million and acquiring Intralinks Holdings, Inc. ("Intralinks") for $821 million in equity value.

14.     On February 24, 2017, the Southern Investigative Reporting Foundation ("SIRF"), published a report accusing Synchronoss of concealing key aspects of the Intralinks and Sequential deals from investors and noting that Sequential was actually Omniglobe USA ("Omniglobe"), a business process outsourcer that has extensive ties to the Company and its senior executives.  In fact, Omniglobe was 50% owned by "friends and family of Synchronoss."

15.     On February 27, 2017, Synchronoss filed a Form 10-K for its annual report for the year ended December 31, 2016 with the SEC  (the "2016 10-K") that revealed that a $9.2 million licensing agreement was entered into between the Company and Sequential for the use of Synchronoss' Analytics software. The $9.2 million amount was recorded as revenue and conveniently allowing the Company to meet its revenue and earnings targets. The Company did not clarify that this $9.2 million amount was a one-time payment and not growth.

16.     After making this disclosure, the Company's stock price fell $1.80 per share, or 5.9%, to close at $28.69 per share on February 27, 2017.

17.     On April 27, 2017, the Company issued a press release announcing management changes. The Company disclosed that its Chief Executive Officer ("CEO"), Defendant Ronald W. Hovsepian ("Hovsepian"), would be leaving the Company "to pursue other interests." According to the press release, Defendant John Frederick ("Frederick"), the Company's Chief Financial Officer ("CFO"), would also be leaving "to pursue other interests." Additionally, the Company admitted that it "expect[ed] total revenue for the first quarter of 2017 to be $13 million to $14 million less than the company's previously announced guidance. Operating margins are expected to be 8% to 10%, which are less than previously announced guidance." Defendant Waldis, who would take over again as CEO, further stated that the Company was "disappointed with our Q1 performance in this first quarter following our acquisition of Intralinks."

18.     After making this disclosure, the Company's stock price fell $11.33 per share, or 46%, to close at $13.29 per share on April 27, 2017, on unusually heavy trading volume.

19.     On May 12, 2017, the Company filed with the SEC a notification of its inability to file with the SEC its quarterly report for the quarter ended March 31, 2017 on Form 10-Q.

20.     On May 15, 2017, the Company issued a press release stating that it needed extra time to file with the SEC its quarterly report for the quarter ended March 31, 2017 because, *inter alia*, Defendant Waldis and newly appointed CFO Lawrence Irving ("Irving") needed time to complete reviews of the accounting of certain transactions conducted in prior financial periods, which they did, and that its independent auditor subsequently advised that additional reviews by

Defendant Waldis and Mr. Irving were needed, which the Company is in the process of completing.

21.     The Company's stock price opened on May 12, 2017 at $15.92 per share, but, due to the additional bad news about the late filing of the quarterly report, closed at $14.49 per share on the next trading day, May 15, 2017.

22.     On May 22, 2017, the Company issued a press release that stated that on May 16, 2017, it received notice from the Listing Qualifications Department of the NASDAQ.  The notice stated that the Company was "not in compliance with Nasdaq Listing Rule 5250(c)(1) because the Company has not yet filed its Quarterly Report on Form 10-Q for the period ended March 31, 2017…."

23.     Due to this yet additional bad news, the Company's stock price fell further to close at $12.82 per share on May 22, 2017.

24.     On June 13, 2017, the Company filed a Form 8-K with the SEC announcing that the Company's previously filed financial statements for the fiscal years ended December 31, 2016 and 2015 and the quarterly periods within those years would need to be restated and could no longer be relied upon.

25.     On this news, the Company's stock price fell further to close at $11.26 per share on June 14, 2017.

26.     From October 28, 2014 through June 13, 2017 (the "Relevant Period"), the Company issued press releases, filed quarterly reports on Form 10-Q and an annual report on Form 10-K, and issued other public statements that contained materially false and misleading statements that artificially inflated the Company's stock price. These statements were materially

false and misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and prospects, which were known to the Individual Defendants or recklessly disregarded by them. Specifically, the Individual Defendants caused the Company to fail to disclose that: (1) an existing vendor (Sequential) had purchased the Company's activation business, and this existing vendor had been owned by Defendant Waldis and other members of the Company's senior management; (2) Omniglobe owns Sequential, and 50% of Omniglobe is owned by family and friends of the Company; (3) Sequential's owner and Chairman is a related party with several ties to Defendant Waldis and the Company; (4) there was a prior and existing relationship between Sequential and the Company; (5) a $9.2 million license agreement between the Company and Sequential was entered into for the lone purpose of artificially inflating the Company's financials; (6) the Company acquired Intralinks and misrepresented its future growth metrics due to the issues facing the Company's cloud computing business since 2015; (7) the newly-acquired Intralinks was underperforming; (8) the Company's integration of other acquisitions was underperforming; (9) the Company was facing serious hurdles integrating, and capitalizing on, its newly acquired companies; (10) as such, the Company's guidance was overstated; (11) the Company improperly recognized revenue; (12) the Company manipulated the figures and metrics in its financial statements; (13) the Company's financial statements were not prepared in accordance with GAAP; (14) the Company failed to maintain internal controls; and (15) as a result of the foregoing, Defendants' statements about Synchronoss' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

27.     Furthermore, during the Relevant Period, the Individual Defendants caused the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations while the vast majority of them engaged in lucrative insider sales. The 2016 10-K stated that: "December 31, 2016, a total of 1.3 million shares have been purchased under the program for an aggregate purchase price of $40 million." As the true value of the Company's common stock was $11.26, the price per share of the Company's common stock when the truth emerged, the Individual Defendants caused Synchronoss  to overpay by over $25.8 million for repurchases of its own stock. At the time of spending $40 million in cash to repurchase stock, the Company had to borrow large amounts of money.

28.     The Individual Defendants breached their fiduciary duties by permitting, facilitating, and causing the Company to make false and misleading statements and/or omissions of material fact, by permitting, facilitating, and causing the Company to fail to correct these false and misleading statements and/or omissions of material fact, and by causing Synchronoss to make the repurchases of Company stock at artificially inflated prices while six of the Individual Defendants engaged in lucrative insider sales of Company stock.

29.     The Individual Defendants further breached their fiduciary duties by failing to maintain internal controls, leading to the Company's forthcoming restatements of its financial statements.

30.     The Individual Defendants' breaches of fiduciary duty and other misconduct have subjected the Company, and current and former executive officers to a consolidated federal securities fraud class action lawsuit pending in the United States District Court for the District of New Jersey styled as *In Re Synchronoss Technologies, Inc. Securities Litigation*, No. 3:17-cv-

02978 (the "Securities Class Action"), the need to undertake internal investigations, the need to retain lawyers and accountants, losses due to the Company's overpayment of millions of dollars for the repurchases of its own stock and to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and of Individual Defendants who received ill-gotten gains from insider sales netting proceeds of millions of dollars, and will cost the Company going forward many millions of dollars.

31.     Such expenditures also include losses incurred as a result of entering into related party transactions that were unfair to the Company, loss of valuable cash assets through the Company's inflated stock buy-backs, and costs associated with restating two years of financial statements. As a further direct and proximate result of the misconduct described herein, Synchronoss has suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future.

32.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

33.     The false and misleading statements and omissions the Individual Defendants caused Synchronoss to make allowed the Company to mislead investors as to the extent of the actual risk involved in investing in Synchronoss. The Company in fact was a materially less-safe investment than Synchronoss led investors to believe.

34.     By virtue of their leadership roles and the fact that these transactions concerned the core operations of the Company, the Individual Defendants at all relevant times knew or recklessly disregarded that the true state of Synchronoss' business, operations, and prospects was materially different from what the Company portrayed to the investing public. Indeed, the

- 10 -

Individual Defendants signed-off on those very statements, in misleading securities filings, press releases, earnings calls and proxy statements.

35.    In addition, the Individual Defendants failed to timely correct and/or caused the Company to fail to correct these false and/or misleading statements and/or omissions of material fact, further rendering them personally liable to the Company for breaching their fiduciary duties.

36.    Even had they not participated in the misleading statements, Synchronoss' pervasive wrongdoing in the above-described schemes could not have escaped the notice of the Individual Defendants had they been appropriately discharging their fiduciary duties to the Company. In other words, even if the Individual Defendants had not intentionally and/or recklessly engaged in such wrongful acts, they consciously chose not to implement and maintain policies and procedures adequate and necessary to ensure such wrongful acts did not occur (i.e., adequate internal controls), in further breach of their fiduciary duties.

## JURISDICTION AND VENUE

37.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a)), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

38.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

39.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

40.     Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, and the Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District. Synchronoss conducts business and maintains its principal executive offices in this District.

## PARTIES

### Plaintiff

41.     Plaintiff is a current shareholder of Synchronoss common stock. Plaintiff has continuously held Synchronoss common stock since prior to the beginning of the Relevant Period.

### Nominal Defendant Synchronoss

42.     Nominal Defendant Synchronoss is a Delaware corporation with its principal executive offices at 200 Crossing Boulevard, 8th Floor, Bridgewater, New Jersey 08807.

43.     Synchronoss is registered to do business in New Jersey. Synchronoss' New Jersey Business Entity ID Number, 0100909639, is listed on the website for the New Jersey Division of Revenue & Enterprise Services, and Synchronoss has an active State of New Jersey Business Registration Certificate Number, 1007036.

44.     Synchronoss stock trades on the NASDAQ under the ticker symbol "SNCR."

### Defendant Rosenberger

45.     Karen L. Rosenberger ("Rosenberger") was the Company's Executive Vice President and CFO during the Relevant Period until resigning on February 27, 2017; her employment was terminated on April 1, 2017. On March 2, 2017, Synchronoss disclosed that Defendant Rosenberger was awarded a severance package that included payment of $1,203,681, a transition payment of $200,000, and a three-month consulting arrangement for which she would be paid $580,000. According to the 2017 Proxy Statement, on March 23, 2016, around a month from the start of the Relevant Period, Defendant Rosenberger beneficially owned over 45 thousand shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 23, 2016 was $30.30, Rosenberger owned over $1.37 million worth of Synchronoss stock.

46.     For the fiscal year ended December 31, 2016, Defendant Rosenberger received $1,720,909 in compensation from the Company. This included almost $400,000 in cash and $307,617 worth of stock options.  Rosenberger's base salary for 2016 was $360,000.

47.     The Company's annual report for the year ended December 31, 2015 on Form 10-K that was filed with the SEC on February 26, 2016 stated the following about Defendant Rosenberger:

> *Karen L. Rosenberger* has served as Chief Financial Officer and Treasurer since April 2014.  Prior to that position, Ms. Rosenberger served in various positions at Synchronoss since joining Synchronoss in 2000, most recently as Senior Vice President, Controller and Chief Accounting Officer.  Before joining Synchronoss, Ms. Rosenberger held various management positions with Medical Broadcasting Company and CoreTech Consulting Group.  Ms. Rosenberger received a degree in accounting from Cedar Crest College and a Master of Business Administration from Saint Joseph's University.  Ms. Rosenberger is a certified public accountant and a member of the American Institute of Certified Public Accountants and the New Jersey Society of Certified Public Accountants.

48.      During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed on June 13, 2017, Defendant Rosenberger made the following sales of Company stock. On November 6, 2014, Defendant Rosenberger sold 1,414 shares of the Company stock for $50,78 per share. On November 24, 2014, Defendant Rosenberger sold 2,000 shares of the Company stock for $43 per share. On December 9, 2014, Defendant Rosenberger sold 2,749 shares of the Company stock for $41.60 per share. On January 2, 2015, Defendant Rosenberger sold 750 shares of the Company stock for $41.65 per share. On January 5, 2015, Defendant Rosenberger sold 111 shares of the Company stock for $41.05 per share. On January 6, 2015, Defendant Rosenberger sold 3,587 shares of the Company stock for $39.36 per share. On February 11, 2015, Defendant Rosenberger sold 463 shares of the Company stock for $41.71 per share. On February 17, 2015, Defendant Rosenberger sold 607 shares of the Company stock for $42.68 per share. On February 23, 2015, Defendant Rosenberger sold 1,340 shares of the Company stock for $43.55 per share. On February 23, 2015, Defendant Rosenberger sold 237 shares of the Company stock for $44.81 per share. On April 2, 2015, Defendant Rosenberger sold 1,910 shares of the Company stock for $47.21 per share. On April 6, 2015, Defendant Rosenberger sold 2,245 shares of the Company stock for $47.17 per share. On May 21, 2015, Defendant Rosenberger sold 68 shares of the Company stock for $46.15 per share. On July 6, 2015, Defendant Rosenberger sold 709 shares of the Company stock for $45.16 per share. On August 21, 2015, Defendant Rosenberger sold 69 shares of the Company stock for $44.51 per share. On October 5, 2015, Defendant Rosenberger sold 689 shares of the Company stock for $33.76 per share. On November 24, 2015, Defendant Rosenberger sold 69 shares of the Company stock for $38.33 per share. On January 5, 2016,

Defendant Rosenberger sold 831 shares of the Company stock for $33.66 per share. On February 3, 2016, Defendant Rosenberger sold 1,466 shares of the Company stock for $27.91 per share. On February 16, 2016, Defendant Rosenberger sold 810 shares of the Company stock for $23.13 per share. On February 18, 2016, Defendant Rosenberger sold 899 shares of the Company stock for $25.43 per share. On February 24, 2016, Defendant Rosenberger sold 70 shares of the Company stock for $25.01 per share. On April 4, 2016, Defendant Rosenberger sold 753 shares of the Company stock for $32.12 per share. On May 24, 2016, Defendant Rosenberger sold 83 shares of Company stock for $35.30 per share.  On July 6, 2016, Defendant Rosenberger sold 787 shares of Company stock for $31.45 per share.  On August 22, 2016, Defendant Rosenberger sold 83 shares of Company stock for $40.77 per share.   On October 3, 2016, Defendant Rosenberger sold 755 shares of Company stock for $40.86 per share.  On November 21, 2016, Defendant Rosenberger sold 83 shares of Company stock for $48.92 per share.  On December 27, 2016, Defendant Rosenberger sold 10,000 shares of Company stock for $39.51 per share.  On December 28, 2016, Defendant Rosenberger sold 4,000 shares of Company stock for $39.63 per share.   On January 4, 2017, Defendant Rosenberger sold 815 shares of Company stock for $38.84 per share.  On January 11, 2017, Defendant Rosenberger sold 3,000 shares of Company stock for $38.07 per share.  On January 23, 2017, Defendant Rosenberger sold 777 shares of Company stock for $39.08 per share.  On February 3, 2017, Defendant Rosenberger sold 2,162 shares of Company stock for $39.00 per share.  On February 8, 2017, Defendant Rosenberger sold 2,000 shares of Company stock for $36.93 per share.  On February 14, 2017, Defendant Rosenberger sold 516 shares of Company stock for $33.73 per share.  On February 21, 2017, Defendant Rosenberger sold 3,183 shares of Company stock for $32.64 per share.  Thus, in total,

before the fraud was exposed, she sold thousands of Company shares on inside information, for which she received millions of dollars.  Her insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate her motive in facilitating and participating in the scheme.

**Defendant Waldis**

49.     Waldis is a founder of Synchronoss, has served as the Company's Chairman of the Board of Directors ("Board") since 2001, throughout the entire Relevant Period, was CEO from 2000 until January 2017, and was renamed CEO of the Company in April 2017 until November 2017. According to the Company's Schedule 14A filed with the SEC on April 6, 2017 (the "2017 Proxy Statement"), on March 23, 2016, around a month from the start of the Relevant Period, Defendant Waldis beneficially owned over 935,000 shares of the Company's common stock, which was about 2% of the Company's issued and outstanding common stock. Given that the price per share of the Company's common stock at the close of trading on March 23, 2016 was $30.30, Waldis owned about $28.3 million worth of Synchronoss stock.

50.     For the fiscal year ended December 31, 2016, Defendant Waldis received $5,707,946 in compensation from the Company. This included almost $700,000 in cash and $1,261,248 worth of stock options.  Waldis' base salary for 2016 was $608,900.

51.     The Company's 2017 Proxy Statement stated the following about Defendant Waldis:

Stephen G. Waldis has served as our Executive Chairman since January 2017, having service as Chairman of the Board of Directors since 2001[,] Chief Executive Officer from 2000 until January 2017 and as a director since founding Synchronoss in 2000. From 2000 until 2011, Mr. Waldis also served as President. From 1994 to 2000, Mr. Waldis served as Chief Operating Officer at Vertek Corporation, a privately held professional services company serving the telecommunications industry. From 1992 to 1994,

Mr. Waldis served as Vice President of Sales and Marketing of Logical Design Solutions, a provider of telecom and interactive services. From 1989 to 1992, Mr. Waldis worked in various technical and product management roles at AT&T. Mr. Waldis received a Bachelor of Arts degree in corporate communications from Seton Hall University. Our Board believes Mr. Waldis' qualifications to sit on our Board include his extensive experience in the software and services industry, and serving as our Chief Executive Officer and one of our founders.

52.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed on June 13, 2017, Defendant Waldis made the following sales of Company stock, according to SEC filings. On November 6, 2014, Defendant Waldis sold 17,318 shares of the Company stock at $51.73.  On November 19, 2014, Defendant Waldis sold 10,000 shares of the Company stock at $43.08 per share. On December 18, 2014, Defendant Waldis sold 10,000 shares of the Company stock at $42.48 per share.  On January 2, 2015, Defendant Waldis sold 5,579 shares of the Company stock at $41.65 per share. On February 11, 2015, Defendant Waldis sold 8,309 shares of the Company stock at $41.71 per share. On February 11, 2015, Defendant Waldis sold 21,000 shares of the Company stock at $42.77 per share. On February 17, 2015, Defendant Waldis sold 20,825 shares of the Company stock at $42.68 per share. On March 18, 2015, Defendant Waldis sold 21,000 shares of the Company stock at $46.90 per share. On April 8, 2015, Defendant Waldis sold 21,000 shares of the Company stock at $47.96 per share. On May 27, 2015, Defendant Waldis sold 21,000 shares of the Company stock at $45.16 per share. On June 10, 2015, Defendant Waldis sold 21,000 shares of the Company stock at $48.79 per share. On July 15, 2015, Defendant Waldis sold 21,000 shares of the Company stock at $46.53 per share. On August 26, 2015, Defendant Waldis sold 21,000 shares of the Company stock at $40.18 per share. On September 16, 2015, Defendant Waldis sold 21,000 shares of the Company stock at $40.48 per share. On January 13,

2016, Defendant Waldis sold 70,000 shares of the Company stock at $30.68 per share. On January 14, 2016, Defendant Waldis sold 24,430 shares of the Company stock at $31.13 per share. On February 3, 2016, Defendant Waldis sold 6,927 shares of the Company stock at $27.91 per share. On February 16, 2016, Defendant Waldis sold 21,869 shares of the Company stock at $23.13 per share. On February 18, 2016, Defendant Waldis sold 4,143 shares of the Company stock at $25.40 per share. On March 2, 2016, Defendant Waldis sold 8,509 shares of the Company stock for $30,00 per share. On March 3, 2016, Defendant Waldis sold 200 shares of the Company stock for $30.01. On March 16, 2016, Defendant Waldis sold 45,721 shares of the Company stock at $30.02 per shares. On March 23, 2016, Defendant Waldis sold 23,000 shares of the Company stock for $30.28 per share. On May 18, 2016, Defendant Waldis sold 13,000 shares of Company stock for $34.83 per share.  On June 8, 2016, Defendant Waldis sold 13,000 shares of Company stock for $36.12 per share.  On July 6, 2016, Defendant Waldis sold 13,000 shares of Company stock for $32.32 per share.  On August 24, 2016, Defendant Waldis sold 13,000 shares of Company stock for $40.61 per share.  On September 14, 2016, Defendant Waldis sold 13,000 shares of Company stock for $40.43 per share. On October 5, 2016, Defendant Waldis sold 13,000 shares of Company stock for $40.85 per share. On February 3, 2017, Defendant Waldis sold 8,265 shares of Company stock for $39.00 per share. On February 14, 2017, Defendant Waldis sold 13,853 shares of Company stock for $33.71 per share.  On February 21, 2017, Defendant Waldis sold 11,852 shares of Company stock for $32.66 per share. On February 23, 2018, Defendant Waldis sold 30,316 shares of Company stock for $8.78 per share. On February 27, 2018, Defendant Waldis sold 6,308 shares of Company stock for $9.60 per share. Thus, in total, before the fraud was exposed, he sold thousands of Company shares on

inside information, for which he received millions of dollars. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

53. According to the Company's Schedule 14A filed with the SEC on April 16, 2020 (the "2020 Proxy Statement"), on April 6, 2020, Defendant Waldis beneficially owned 871,457 shares of the Company's common stock, which was about 2% of the Company's issued and outstanding common stock. Given that the price per share of the Company's common stock at the close of trading on April 6, 2020 was $3.11 Waldis owned about $2,710,231.27 worth of Synchronoss stock.

54. For the fiscal year ended December 31, 2020, Defendant Waldis received $575,146 in compensation from the Company. This included $300,000 in cash, $11,889 in other compensation, $156,754 in stock awards, and $104,504 worth of stock options.

55. The Company's 2002 Proxy Statement stated the following about Defendant Waldis:

> **Stephen G. Waldis** has served as our Executive Chairman since January 2017, having served as Chairman of the Board of Directors since 2001 Chief Executive Officer from 2000 until January 2017 and as a director since founding Synchronoss in 2000. From 2000 until 2011, Mr. Waldis also served as President. From 1994 to 2000, Mr. Waldis served as Chief Operating Officer at Vertek Corporation, a privately held professional services company serving the telecommunications industry. From 1992 to 1994, Mr. Waldis served as Vice President of Sales and Marketing of Logical Design Solutions, a provider of telecom and interactive solutions. From 1989 to 1992, Mr. Waldis worked in various technical and product management roles at AT&T. Mr. Waldis received a Bachelor of Arts degree in corporate communications from Seton Hall University. Our Board believes Mr. Waldis' qualifications to sit on our Board include his extensive experience in the software and services industry and serving as our Chief Executive Officer and one of our founders.

**Defendant Cadogan**

56.     William J. Cadogan has been on the Company's Board since 2005, throughout the entire Relevant Period. According to the 2017 Proxy Statement, on March 23, 2016, around a month from the start of the Relevant Period, Defendant Cadogan beneficially owned about 344,852 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 23, 2016 was $30.30, Cadogan owned over $10.4 million worth of Synchronoss stock.

57.     For the fiscal year ended December 31, 2016, Defendant Cadogan received $283,194 in compensation from the Company.  This included $85,000 in cash, $119,997 in stock awards, and $78,197 worth of stock options.

58.     The Company's 2017 Proxy Statement stated the following about Defendant Cadogan:

> William J. Cadogan served as a Senior Managing Director with Vesbridge Partners, LLC, formerly St. Paul Venture Capital, a venture capital firm from 2001 until 2006. Mr. Cadogan served as Chief Executive Officer and Chairman of the board of directors of Mahi Networks, Inc., a leading supplier of multi-service optical transport and switching solutions, from November 2004 until its merger with Meriton Networks in October 2005. Prior to joining St. Paul Venture Capital in 2001, Mr. Cadogan was Chairman and Chief Executive Officer of ADC, Inc., a leading global supplier of telecommunications infrastructure products and services. Mr. Cadogan received a Bachelor of Arts degree in electrical engineering from Northeastern University and a master in business administration degree from the Wharton School at the University of Pennsylvania. Our Board believes Mr. Cadogan's qualifications to sit on our Board include his experience as a CEO leading complex global organizations, combined with his operational and corporate governance expertise.

59.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed on June 13, 2017, Defendant Cadogan made the following sales of Company stock according to SEC filings. On November

- 20 -

10, 2014, Defendant Cadogan sold 5,000 shares of Company stock for $51.70 per share. On November 17, 2014, Defendant Cadogan sold 4,000 shares of Company stock for $48.09 per share. On November 18, 2014, Defendant Cadogan sold 1,000 shares of Company stock for $48.00 per share.  On January 5, 2016, Defendant Cadogan sold 10,000 shares of Company stock for $33.94 per share. On February 9, 2016, Defendant Cadogan sold 25,000 shares of Company stock for $22.96 per share.  On December 30, 2016, Defendant Cadogan sold 20,000 shares of Company stock for $38.56 per share.  On January 4, 2017, Defendant Cadogan sold 7,500 shares of Company stock for $39.39 per share. Thus, in total, before the fraud was exposed, he sold thousands of Company shares on inside information, for which he received over millions dollars. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

60.     According to the 2020 Proxy Statement, as of April 6, 2020, Defendant Cadogan beneficially owned 513,945 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 6, 2020 was $3.11, Cadogan owned $1,598,368.95 worth of Synchronoss stock.

61.     For the fiscal year ended December 31, 2019, Defendant Cadogan received $257,503 in compensation from the Company. This included $83,333 in cash, $104,500 in stock awards, and $69,670 worth of stock options.

62.     The Company's 2020 Proxy Statement stated the following about Defendant Cadogan:

> **William J. Cadogan** served as a Senior Managing Director with Vesbridge Partners, LLC, formerly St. Paul Venture Capital, a venture capital firm from

2001 until 2006. Mr. Cadogan served as Chief Executive Officer and Chairman of the board of directors of Mahi Networks, Inc., a leading supplier of multi-service optical transport and switching solutions, from November 2004 until its merger with Meriton Networks in October 2005. Prior to joining St. Paul Venture Capital in 2001, Mr. Cadogan was Chairman and Chief Executive Officer of ADC, Inc., a leading global supplier of telecommunications infrastructure products and services. Mr. Cadogan received a Bachelor of Arts degree in electrical engineering from Northeastern University and a master's in business administration from the Wharton School at the University of Pennsylvania. Our Board believes Mr. Cadogan's qualifications to sit on our Board include his experience as a CEO leading complex global organizations, combined with his operational and corporate governance expertise.

### Defendant Hopkins

63.     Thomas J. Hopkins ("Hopkins") has been on the Company's Board  since 2004 and during the entire Relevant Period. According to the 2017 Proxy Statement, on March 23, 2016, around a month from the start of the Relevant Period, Defendant Hopkins beneficially owned about 84,678 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 23, 2016 was $30.30, Hopkins owned over $2.5 million worth of Synchronoss stock.

64.     For the fiscal year ended December 31, 2016, Defendant Hopkins received $275,694 in compensation from the Company. This included $77,500 in cash, $119,997 in stock awards, and $78,197 worth of stock options.

65.     The Company's 2017 Proxy Statement stated the following about Defendant Hopkins:

Thomas J. Hopkins is a Managing Director of Colchester Capital, LLC, an investment firm. Prior to Colchester Capital, Mr. Hopkins was involved in investment banking, principally at Deutsche Bank (and its predecessor Alex, Brown & Sons), Goldman, Sachs & Co. and Bear Stearns. He began his investment banking career at Drexel Burnham Lambert. Prior to investment banking, Mr. Hopkins was a lawyer for several years. Mr. Hopkins received a Bachelor of Arts degree from Dartmouth College, a juris

doctorate from Villanova University School of Law and a master in business administration degree from the Wharton School at the University of Pennsylvania. Our Board believes Mr. Hopkins' qualifications to sit on our Board include his extensive financial expertise and his years of experience providing strategic advisory services to complex organizations.

66. During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed on June 13, 2017, Defendant Hopkins made the following sale of Company stock, according to SEC filings. On November 17, 2014, Defendant Hopkins sold 10,000 shares of Company stock for $47.50 per share. On January 12, 2015, Defendant Hopkins sold 10,000 shares of Company stock for $36.90 per share. On November 12, 2015, Defendant Hopkins sold 25,000 shares of Company stock for $36.90 per share. On December 15, 2016, Defendant Hopkins sold 27,500 shares of Company stock for $41.65 per share. Thus, in total, before the fraud was exposed, he sold thousands of Company shares on inside information, for which he received over one million dollars. His insider sale, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

67. According to the 2020 Proxy Statement, as of April 6, 2020, Defendant Hopkins beneficially owned 114,356 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 6, 2020 was $3.11, Hopkins owned $355,647.16 worth of Synchronoss stock.

68. For the fiscal year ended December 31, 2019, Defendant Hopkins received $256,670 in compensation from the Company. This included $82,500 in cash, $104,500 in stock awards, and $69,670 worth of stock options.

69.     The Company's 2020 Proxy Statement stated the following about Defendant Hopkins:

> **Thomas J. Hopkins** is a Managing Director of Colchester Capital, LLC, an investment firm. Prior to Colchester Capital, Mr. Hopkins was involved in investment banking, principally at Deutsche Bank (and its predecessor Alex, Brown & Sons), Goldman, Sachs & Co. and Bear Stearns. He began his investment banking career at Drexel Burnham Lambert. Prior to investment banking, Mr. Hopkins was a lawyer for several years. Mr. Hopkins received a Bachelor of Arts degree from Dartmouth College, a juris doctorate from Villanova University School of Law and a master's in business administration from the Wharton School at the University of Pennsylvania. Our Board believes Mr. Hopkins' qualifications to sit on our Board include his extensive financial expertise and his years of experience providing strategic advisory services to complex organizations.

## Defendant McCormick

70.     James M. McCormick ("McCormick") is one of Synchronoss' founders and was on the Company's Board since the Company was founded in 2000 and during the entire Relevant Period. According to the 2017 Proxy Statement, on March 23, 2016, around a month from the start of the Relevant Period, Defendant McCormick beneficially owned over 3.1 million shares of the Company's common stock, which was almost 7% of the Company's issued and outstanding common stock. Given that the price per share of the Company's common stock at the close of trading on March 23, 2016 was $30.30, McCormick owned over $94.7 million worth of Synchronoss stock.

71.     For the fiscal year ended December 31, 2016, Defendant McCormick received $248,194 in compensation from the Company.  This included $50,000 in cash, $119,997 in stock awards, and $78,197 worth of stock options.

72.     The Company's 2017 Proxy Statement stated the following about Defendant McCormick:

> James M. McCormick is a founder of Synchronoss, has been a member of our Board since our inception in 2000 and served as our Treasurer from September 2000 until December 2001. Mr. McCormick is founder and Chief Executive Officer of Vertek Corporation. Prior to founding Vertek in 1988, Mr. McCormick was a member of the Technical Staff at AT&T Bell Laboratories. Mr. McCormick received a Bachelor of Science degree in computer science from the University of Vermont and a master of science degree in computer science from the University of California — Berkeley. Our Board believes Mr. McCormick's qualifications to sit on our Board include his over 25 years in the consulting, telecommunications and services business, as well as being one of our founders.

73.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed on June 13, 2017, Defendant McCormick made the following sale of Company stock. On November 10, 2014, Defendant McCormick sold 10,500 shares of Company stock for $51.83 per share. On November 12, 2014, Defendant McCormick sold 50,000 shares of Company stock for $50.35 per share. On November 20, 2014, Defendant McCormick sold 18,516 shares of Company stock for $42.37 per share. On November 24, 2014, Defendant McCormick sold 50,000 shares of Company stock for $43.13 per share. On December 2, 2014, Defendant McCormick sold 50,000 shares of Company stock for $41.08 per share. On December 10, 2014, Defendant McCormick sold 50,000 shares of Company stock for $40.78 per share. On December 18, 2014, Defendant McCormick sold 50,000 shares of Company stock for $42.61 per share. On December 22, 2014, Defendant McCormick sold 50,000 shares of Company stock for $42.57 per share. On December 23, 2014, Defendant McCormick sold 21,136 shares of Company stock for $42.75 per share. On December 30, 2014, Defendant McCormick sold 23,263 shares of Company stock for $42.66 per share. On December 31, 2014, Defendant McCormick sold 26,737 shares of Company stock for $42.16 per

share. On January 8, 2015, Defendant McCormick sold 50,000 shares of Company stock for $40.71 per share. On January 15, 2015, Defendant McCormick sold 800 shares of Company stock for $40.00 per share. On January 16, 2015, Defendant McCormick sold 20,398 shares of Company stock for $40.51 per share. On January 20, 2015, Defendant McCormick sold 32,719 shares of Company stock for $41.18 per share. On January 21, 2015, Defendant McCormick sold 17,281 shares of Company stock for $41.34 per share. On January 28, 2015, Defendant McCormick sold 50,000 shares of Company stock for $42.24 per share. On February 3, 2015, Defendant McCormick sold 10,000 shares of Company stock for $45.00 per share. On February 3, 2015, Defendant McCormick sold 50,000 shares of Company stock for $42.24 per share. On February 9, 2015, Defendant McCormick sold 50,000 shares of Company stock for $42.21 per share. On February 17, 2015, Defendant McCormick sold 28,802 shares of Company stock for $43.28 per share. On December 23, 2015, Defendant McCormick sold 25,000 shares of Company stock for $35.86 per share. On August 4, 2016, Defendant McCormick sold 27,500 shares of Company stock for $40.00 per share. Thus, in total, before the fraud was exposed, he sold thousands of shares Company shares on inside information, for which he received over millions of dollars. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

74.    According to the 2020 Proxy Statement, as of April 6, 2020, Defendant McCormick beneficially owned 3,155,910 shares of the Company's common stock, over 7% of shares outstanding. Given that the price per share of the Company's common stock at the close

of trading on April 6, 2020 was $3.11, McCormick owned $ 9,814,880.10 worth of Synchronoss stock.

75.     For the fiscal year ended December 31, 2019, Defendant McCormick received $335,305 in compensation from the Company. This included $23,958 in cash, $121,208 in stock awards, and $190,139 worth of stock options.

**Defendant Moore**

76.     Donnie M. Moore ("Moore") had been on the Company's Board since 2007 and during the entire Relevant Period.  According to the 2017 Proxy Statement, on March 23, 2016, around a month from the start of the Relevant Period, Defendant Moore beneficially owned 96,092 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on March 23, 2016 was $30.30, Moore owned over $2.9 million worth of Synchronoss stock.

77.     For the fiscal year ended December 31, 2016, Defendant Moore received $273,194 in compensation from the Company.  This included $75,000 in cash, $119,997 in stock awards, and $78,197 worth of stock options.

78.     The Company's 2017 Proxy Statement stated the following about Defendant Moore:

> Donnie M. Moore was Senior Vice President, Finance and Administration and Chief Financial Officer for Cognos Incorporated, a publicly-held company providing business intelligence and performance management solutions, from 1989 until his retirement in 2001. From 1986 to 1989, Mr. Moore was Vice President, Finance and Chief Financial Officer of Cognos. Before joining Cognos, Mr. Moore held various positions at the Burroughs Corporation from 1973 to 1986, including Corporate Director, Plans and Analysis. Mr. Moore holds a Bachelor of Science degree in engineering from the University of Oklahoma and a master in business administration degree from the University of Houston. Our Board believes Mr. Moore's qualifications to sit on our

- 27 -

Board include his extensive experience in the software industry and his financial expertise.

79.    During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed on June 13, 2017, Defendant Moore made the following sales of Company stock, according to SEC filings. On November 7, 2014, Defendant Moore sold 2,500 shares of Company stock at $51.97 per share. On November 11, 2014, Defendant Moore sold 5,000 shares of Company stock at $53.12 per share. On December 23, 2015, Defendant Moore sold 5,000 shares of Company stock at $35.89 per share. On September 12, 2016, Defendant Moore sold 5,500 shares of Company stock for $40.63 per share.  On October 12, 2016, Defendant Moore sold 5,500 shares of Company stock for $39.38 per share.  On November 14, 2016, Defendant Moore sold 5,500 shares of Company stock for $47.93 per share. On December 13, 2016, Defendant Moore sold 5,500 shares of Company stock for $41.15 per share. On January 12, 2017, Defendant Moore sold 5,500 shares of Company stock for $38.19 per share. Thus, in total, before the fraud was exposed, he sold thousands of Company shares on inside information, for which he received over one million dollars. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

80.    According to the 2020 Proxy Statement, for the fiscal year ended December 31, 2019, Defendant Moore received $340,513 in compensation from the Company. This included $29,166 in cash, $121,208 in stock awards, and $190,139 worth of stock options.

**Defendant Hovsepian**

81.     Hovsepian was the Company's CEO and a member of the Board from January 19, 2017, and principal executive officer from March 1, 2017, until his resignation on April 27, 2017. Previously, from December 2011 until its sale to Synchronoss in January 2017, Defendant Hovsepian was President, Chief Executive Officer and Director of Intralinks.   According to the 2017 Proxy Statement, as of March 27, 2017, Defendant Hovsepian beneficially owned about 54,780 shares of the Company's common stock.   Given that the price per share of the Company's common stock at the close of trading on March 27, 2017 was $24.59, Hovsepian owned over $1.3 million worth of Synchronoss stock.

82.     The Company's 2017 Proxy Statement stated the following about Defendant Hovsepian:

> *Ronald W. Hovsepian* has served as our Chief Executive Officer and a member of the Board since January 2017. Previously, from December 2011 until its sale to Synchronoss in January 2017, Mr. Hovsepian served as President, Chief Executive Officer and Director of Intralinks. Prior to his role at Intralinks, Mr. Hovsepian served as President and Chief Executive Officer of Novell, Inc. from 2006 until Novell's acquisition by the Attachmate Group in April 2011. He joined Novell in 2003 as President, North America, and next served as Executive Vice President and President, worldwide field operations, and as President and Chief Operating Officer from 2005 until his appointment as Chief Executive Officer in 2006. Prior to his time at Novell, Mr. Hovsepian held a series of management and executive positions at IBM Corporation over an approximately 17-year period, including worldwide general manager of IBM's distribution industries, manager of global hardware and software development, sales, marketing and services. Mr. Hovsepian currently serves as a member of the board of directors of ANSYS, Inc., an engineering simulation software publicly-held company, a role he has held since 2012, and, from November 2014 to December 2016, he also held the position of non-executive chairman. From 1998 to 2015, Mr. Hovsepian served as a member of the board of directors of ANN Inc., a women's fashion retailer. He also held the position of non-executive chairman of ANN's board of directors from 2005 to 2015. Mr. Hovsepian received a Bachelor of Science degree from the Carroll School of Management at Boston College. Our Board believes Mr. Hovsepian's qualifications to sit on our Board include his extensive experience in the software and services industry, as well as his position as our Chief Executive Officer.

**Defendant Frederick**

83.     John W. Frederick ("Frederick") was the Company's CFO from February 27, 2017 until he resigned on April 27, 2017 "to pursue other interests." According to the 2017 Proxy Statement, as of March 27, 2017, Defendant Frederick beneficially owned about 53,971 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 27, 2017 was $24.59, Frederick owned over $1.3 million worth of Synchronoss stock.

84.     The Company's 2017 Proxy Statement stated the following about Defendant Frederick:

> *John W. Frederick* has served as our Chief Financial Officer since February 2017. Prior to joining our Company, he served as Executive Vice President, Chief Financial Officer and Chief Administrative Officer of Avid Technologies, Inc. from April 2013 through May 2016 and, prior to that, he served as Chief of Staff of Avid from February 2013 to April 2013. From November 2009 until joining Avid, Mr. Frederick was Executive Vice President and Chief Financial Officer of Open Solutions, Inc., a technology provider to financial institutions worldwide, which was acquired in January 2013 by Fiserv, Inc. From October 2006 to October 2007, Mr. Frederick served first as interim Chief Financial Officer and then as Chief Financial Officer of SafeNet, Inc., a global encryption security company. After a brief transition in connection with the acquisition of SafeNet, he rejoined SafeNet as Chief Financial Officer in November 2007 and served in that role until August 2009. Additionally, Mr. Frederick has held a variety of senior financial, business planning, and analysis roles at organizations including AlliedSignal (now part of Honeywell), Time Warner and Sunbeam Corporation. Early in his career, he also served in the audit practice of Coopers & Lybrand, now part of PricewaterhouseCoopers LLP. Mr. Frederick received a degree in economics from the University of Maryland and is a certified public accountant in the state of Maryland (inactive).

**Defendant Rinne**

85.     Kristin S. Rinne ("Rinne") had been on the Company's Board since July 2018. According to the 2020 Proxy Statement, as of April 6, 2020, Defendant Rinne beneficially owned 42,868 shares of the Company's common stock. Given that the price per share of the

Company's common stock at the close of trading on April 6, 2020 was $3.11, Rinne owned over

$133,319.48 worth of Synchronoss stock.

86.     For the fiscal year ended December 31, 2019, Defendant Rinne received $234,170

in compensation from the Company. This included $60,000 in cash, $104,500 in stock awards,

and $69,670 worth of stock options.

87.     The Company's 2020 Proxy Statement stated the following about Defendant

Rinne:

> **Kristin S. Rinne** held various senior positions at ATT, including heading the
> company's networks technologies organization, until she retired in 2014.
> Ms. Rinne brought early leadership in deploying GSM technology in the United
> States, setting the stage for the success of the 3GPP family of technologies.
> Ms. Rinne formerly held the positions of vice president of technology strategy
> for SBC Wireless and managing director of operations at Southwestern Bell
> Mobile Services. Her contributions to the industry also include serving as
> chairperson of the Board of Governors at 3G Americas, LLC, and the Alliance
> for Telecommunications Industry Solutions (ATIS). Ms. Rinne is a "Women in
> Technology Hall-of-Famer", as well as a member of the "Wireless Hall of
> Fame," and was named among Fierce Wireless' "Top 10 Most Influential
> Women in Wireless" list from 2011 through 2014. Ms. Rinne holds a bachelor's
> degree from Washburn University. Our Board believes Ms. Rinne's
> qualifications to sit on our Board include her extensive experience in the
> telecommunications industry.

### Defendant Gyani

88.     Mohan Gyani ("Gyani") had been on the Company's Board since January 2019.

According to the 2020 Proxy Statement, as of April 6, 2020, Defendant Gyani beneficially

owned 27,679 shares of the Company's common stock. Given that the price per share of the

Company's common stock at the close of trading on April 6, 2020 was $3.11, Gyani owned over

$86,081.69 worth of Synchronoss stock.

- 31 -

89.     For the fiscal year ended December 31, 2019, Defendant Gyani received $228,336 in compensation from the Company. This included $54,166 in cash, $104,500 in stock awards, and $69,670 worth of stock options.

90.     The Company's 2020 Proxy Statement stated the following about Defendant Gyani:

> **Mohan Gyani** held several executive positions in the telecommunications industry including at AT&T Wireless from 2000 until he retired in 2003 as President and Chief Executive Officer of AT&T Wireless Mobility Services. Prior to AT&T, Mr. Gyani was Executive Vice President and CFO of AirTouch from 1994 to 1999. Mr. Gyani has served on numerous public and private company boards and is currently a member of the Board of Directors of Digital Turbine and MUFG Union Bank. Mr. Gyani received a bachelor's degree and master's in business administration from San Francisco State University. Our Board believes Mr. Gyani's qualifications to sit on our Board include his extensive experience in the telecom and wireless industries and in senior financial positions.

**Defendant Baker**

91.      Frank Baker ("Baker") had been on the Company's Board since February 2018. According to the 2020 Proxy Statement, as of April 6, 2020, Defendant Baker beneficially owned 11,080,588 shares of the Company's common stock, about 19.9% of shares outstanding. Given that the price per share of the Company's common stock at the close of trading on April 6, 2020 was $3.11, Baker owned over $34,460,628.68 worth of Synchronoss stock.

92.     For the fiscal year ended December 31, 2019, Defendant Baker received $234,170 in compensation from the Company. This included $60,000 in cash, $104,500 in stock awards, and $69,670 worth of stock options.

93.     The Company's 2020 Proxy Statement stated the following about Defendant Baker:

> **Frank Baker** joined our Board in February 2018 as part of the Siris Series A Preferred Stock transaction. Mr. Baker is a Managing Partner of Siris Capital Group, which he co-founded in 2011 and is a board member of all Siris Capital Group's portfolio companies. Mr. Baker has an M.B.A. from Harvard Business School and a degree in Economics from the University of Chicago. Mr. Baker also serves as a trustee of the University of Chicago. Our Board believes Mr. Baker's qualifications to sit on our Board include his extensive financial expertise and his years of experience providing strategic advisory services to complex organizations.

### Defendant Berger

94.     Peter Berger ("Berger") had been on the Company's Board since February 2018. According to the 2020 Proxy Statement, as of April 6, 2020, Defendant Berger beneficially owned 11,080,588 shares of the Company's common stock, about 19.9% of shares outstanding. Given that the price per share of the Company's common stock at the close of trading on April 6, 2020 was $3.11, Berger owned $34,460,628.68 worth of Synchronoss stock.

95.     For the fiscal year ended December 31, 2019, Defendant Berger received $236,670 in compensation from the Company. This included $62,500 in cash, $104,500 in stock awards, and $69,670 worth of stock options.

96.     The Company's 2020 Proxy Statement stated the following about Defendant Berger:

> **Peter Berger** joined our Board in February 2018 as part of the Siris Series A Preferred Stock transaction. Mr. Berger is a Managing Partner of Siris Capital Group, which he co-founded in 2011 and is a board member of all Siris Capital Group's portfolio companies. Mr. Berger has an M.B.A. from Columbia University Graduate School of Business and received a degree in Math and Accounting from Boston University. Our Board believes Mr. Berger's qualifications to sit on our Board include his extensive financial expertise and his years of experience providing strategic advisory services to complex organizations.

**Defendant Aquilina**

97.     Robert Aquilina ("Aquilina") had been on the Company's Board since 2018. According to the 2020 Proxy Statement, as of April 6, 2020, Defendant Aquilina beneficially owned 52,868 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 6, 2020 was $3.11, Aquilina owned over $164,419.48 worth of Synchronoss stock.

98.     For the fiscal year ended December 31, 2019, Defendant Aquilina received $224,170 in compensation from the Company. This included $50,000 in cash, $104,500 in stock awards, and $69,670 worth of stock options.

99.     The Company's 2020 Proxy Statement stated the following about Defendant Aquilina:

> **Robert Aquilina** has been an Executive Partner (a senior advisory role) for Siris Capital Group since 2011. Prior to Siris Capital Group, Mr. Aquilina was an executive of AT&T, Inc. for 22 years, with his last position being Co-President of AT&T Consumer Services and a member of the Chairman's Operating Group. Previously within AT&T, Mr. Aquilina held a variety of senior positions including President of Europe, Middle East & Africa; Vice Chairman of AT&T Unisource; Vice Chairman of World Partners; and General Manager of Global Data Services. Mr. Aquilina has an M.B.A. from University of Chicago and received a degree in Engineering from The Cooper Union for the Advancement of Science and Art. Our Board believes Mr. Aquilina's qualifications to sit on our Board include his extensive business experience and his years of experience providing strategic advisory services to complex organizations

**Defendant Lurie**

100.     Glenn Lurie ("Lurie") is Synchronoss' CEO and had been on the Company's Board since 2017. According to the 2020 Proxy Statement, as of April 6, 2020, Defendant Lurie beneficially owned 931,587 shares of the Company's common stock, about 2.1% of shares

outstanding. Given that the price per share of the Company's common stock at the close of trading on April 6, 2020 was $3.11, Lurie owned over $2,897,235.57 worth of Synchronoss stock.

101.    For the fiscal year ended December 31, 2019, Defendant Lurie received $772,500 as a base salary as serving as CEO, he also is entitled to bonuses. According to the 2020 Proxy Statement, Defendant Lurie does not receive compensation as a Director.

102.    The Company's 2020 Proxy Statement stated the following about Defendant Lurie:

> **Glenn Lurie** joined Synchronoss as Chief Executive and President in November 2017. Prior to joining Synchronoss, Mr. Lurie held several senior positions at AT&T Inc., most recently as President and Chief Executive Officer of AT&T's Mobility and Consumer Operations, until his retirement from AT&T in September 2017. Mr. Lurie led the team responsible for negotiating its exclusive U.S. agreement with Apple Inc. to launch the first iPhone in 2007. Mr. Lurie is a member of the Board of AvisBudget Inc. and serves on the Delphi Technology Advisory Council. He previously served as chairman of the board for the Consumer Technology Industry Association in 2016. Mr. Lurie holds a Bachelor of Arts in Business/Marketing from Seattle Pacific University.

**Defendant Garcia**

103.    Defendant Robert E. Garcia ("Garcia") has served as President of Synchronoss since 2011 and as Chief Operating Officer ("COO") since 2007. Prior to that, Garcia served in various positions at Synchronoss, including as Executive Vice President of Operations and Service Delivery, and General Manager of Synchronoss' western office since joining Synchronoss in August 2000. During the period of misconduct, Synchronoss was forced to pay Garcia a sum of $23,022,977 in total compensation, and while in possession of material, non-public information, Garcia sold at least 325,242 personally held shares of Synchronoss stock at artificially inflated prices for proceeds of approximately $12,253,070.

**Defendant Irving**

104.   Defendant Lawrence Irving ("Irving") served as CFO and Treasurer of Synchronoss from April 2017 until August 2018, having previously occupied the same positions from July 2001 until April 2014. During the period of misconduct, Synchronoss was forced to pay Irving a sum of $10,933,901 in total compensation.

**Defendant Harris**

105.   Defendant Laurie Harris ("Harris") has served as a Director since August 2019. Harris is the Chairperson of the Audit Committee and was designated by Synchronoss as a Financial Expert. In 2019, the Company paid Harris $284,366.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

106.   By reason of their positions as officers, directors and/or fiduciaries of Synchronoss and because of their ability to control the business and corporate affairs of Synchronoss, the Individual Defendants owed Synchronoss and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Synchronoss in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Synchronoss and its shareholders so as to benefit all shareholders equally.

107.   Each director and officer of the Company owes to Synchronoss and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

108.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Synchronoss, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

109.    To discharge their duties, the officers and directors of Synchronoss were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

110.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Synchronoss, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.  The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Synchronoss' Board at all relevant times.

111.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management,

earnings, internal controls, and present and future business prospects, so that the market price of the Company's common stock would be based upon truthful and accurate information.

112. To discharge their duties, the officers and directors of Synchronoss were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Synchronoss were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, the United States, and pursuant to Synchronoss' own internal guidelines;

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Synchronoss conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Synchronoss and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Synchronoss' operations would comply with

all laws and Synchronoss' financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company;

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above; and

(i)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock.

113.    Each of the Individual Defendants further owed to Synchronoss and the shareholders the duty of loyalty requiring that each favor Synchronoss' interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

114.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Synchronoss and were at all times acting within the course and scope of such agency.

115.    Because of their advisory, executive, managerial, and directorial positions with Synchronoss, each of the Individual Defendants had access to adverse, non-public information about the Company.

116.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Synchronoss.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

117.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

118.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act; (ii) to conceal adverse information concerning the Company's operations, financial condition, competitors, future business prospects and internal controls; and (iii) to artificially inflate the Company's stock price.

119.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.  Because the actions described herein occurred under the authority of the Board,

each of the Individual Defendants who are directors of Synchronoss was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

120.   Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

121.   At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Synchronoss, and was at all times acting within the course and scope of such agency.

## SUBSTANTIVE ALLEGATIONS

### Background of Formation of Synchronoss

122.   Defendants Waldis and McCormick have known each other since at least the early 1990s. Both worked at Vertek Corp. ("Vertek"), a privately held firm McCormick founded, from 1994 to 2000. Waldis and McCormick, acting as partners, rebuilt Vertek whereby 84% was owned by McCormick and 16% was owned by Waldis. Waldis became Vertek's chief operating officer.

123.   With their success, Waldis and McCormick spun off part of Vertek to form Synchronoss. Waldis left Vertek, divesting his Vertek shares, to run Synchronoss in 2000.

124.   In registering with the SEC to sell shares to the public in 2006, Synchronoss stated its "CSP customers rely on our services to speed, simplify and automate the process of activating their customers and delivering communications services across interconnected networks ..."

125.   Synchronoss conducted business with a vendor called Omniglobe International, LLC. Omniglobe, according to a Form S-1 that Synchronoss filed with the SEC in 2006, "provides data entry services relating to the Company's exception handling management. The Company paid Omniglobe an hourly rate for each hour worked by each of its data entry agents." Payments to Omniglobe totaled more than $8 million in 2005.

126.   Before Synchronoss sold shares publicly, a group of four Synchronoss insiders used to own, indirectly, a total of 18.68% of Omniglobe. Waldis owned the biggest share, at 12.23%. Irving, David E. Berry ("Berry") and Robert Garcia ("Garcia") were the other Synchronoss insiders with interests in Omniglobe.

127.   Irving was the CFO of Synchronoss from 2001 until 2014. He returned to that position in April 2017 until August 2018.

128.   Garcia was Synchronoss' president and Chief Operating Officer. Berry was Synchronoss' Executive Vice President and Chief Innovation Officer.

129.   Waldis and the other Synchronoss insiders did not own shares of Omniglobe directly. Rather, these individual owned "indirect equity interest in Omniglobe." From a Form S-1 from 2006, these individual controlled stock in a Delaware limited liability company called Rumson Hitters, LLC ("Rumson Hitters") which owned an interest in Omniglobe.

130.    On March 12, 2004, Waldis, Irving, Berry, and Garcia acquired their interest in Rumson Hitters.

131.    Rumson Hitters was created to support Synchronoss' business.

132.    Waldis bought into Rumson Hitters for $95,000, paid on his and his family's behalf. Irving and Berry paid $20,000 each on behalf of themselves and their families. Garcia paid $10,000.

133.    Waldis, Irving, Berry, and Garcia held Rumson Hitters shares for over two years. The business provided enough cash over that time to generate generous returns.

134.    Waldis and his family receive $154,000 in distributions. Irving received $32,000 in distributions. Berry and his family received $32,000 in distributions. Garcia received $16,500 in distributions.

135.    According to Synchronoss' SEC filings, Waldis, Irving, Berry, and Garcia and their families sold their entire interest in Rumson Hitters for the same price they paid. According to Synchronoss, the Rumson Hitters shares were sold as of June 20, 2006. Synchronoss sold shares to the public on June 15, 2006.

136.    Sequential, who later bought much of Synchronoss' Activation business, was formerly known as Omniglobe.

137.    At the time of the Activation transaction to Sequential, Sequential was owned and controlled by these former owners of Omniglobe and Rumon Hitters.

**Synchronoss' Accounting Policies and Revenue Recognition**

138.    Synchronoss had a policy of recognizing revenue on contracts after they were signed. Despite this policy, the Company, notably under Defendant Rosenberger's watch, had a

practice of improperly recognizing revenue on contracts before they were signed which were against Company policy and accounting standards

139.   Synchronoss' financial statements were not prepared in accordance with GAAP and eventually the Company announced that financial statements needed to be restated, (and did restate the financial statements) and that the Company had material weaknesses in its internal controls.

140.   Synchronoss violated Accounting Standard Codification ("ASC"), specifically ASC 985-605-25-3 (which established basic revenue recognition criteria for software licenses and provides that revenue may only be recognized when "[p]ervasive evidence of an arrangement exists"), ASC 985-605-25-16 (which states "If the vendor has a customary business practice of using written contracts, evidence of the arrangement is provided only by a contract signed by both parties" and ASC 985-605-25-17 (which provides that "revenue shall not be recognized on any element of the arrangement unless pervasive evidence of an arrangement exists").

141.   Ernst & Young, Synchronoss' auditor, published software revenue recognition guidelines (revised in September 2016) that stated:

> If a vendor's customary practice is to obtain signed contracts to evidence an arrangement, revenue recognition is precluded if a contract signed by both parties is not in hand at the end of an accounting period, even if the contract is executed soon thereafter and management believes that execution of the contract is merely perfunctory. Letters of intent, memoranda of understanding and similar documents are not acceptable evidence of the arrangement.

142.   Synchronoss and its customers had a practice of using written contracts when entering into business arrangements. This is confirmed by the language that Synchronoss uses in

its annual filings to describe contracts that it has entered into. For example, Synchronoss' 2016 10-K contained the following statements that reflect the Company's practice of using written contracts:

> (a)    "We generate a substantial portion of our revenues on a per transaction or subscription basis, which is derived from contracts that extend up to 60 months from execution.";

> (b)    "In periods of economic slowdown our typical sales cycle lengthens, which means that the average time between our initial contact with a prospective customer and the signing of a sales contract increases.";

> (c)    "Because we recognize revenue for certain of our products and services ratably over the term of our customer agreements, downturns or upturns in the value of signed contracts will not be fully and immediately reflected in our operating results."

143.    Defendants Waldis and Rosenberger were aware of this requirement since Waldis signed a "master" contract with AT&T which expressly stated that all subsequent order must be confirmed in a signed, written contract. The September 1, 2005 Master Service Agreement, which governed the relationship with Synchronoss and AT&T provides: "This Agreement and any Orders placed hereunder may be amended or modified only by a written document signed by the authorized representative of the Party against whom enforcement is sought." This agreement was signed by Waldis and Rosenberger discussed the agreement with analysts at least at the November 16, 2016 Credit Suisse Technology, Media, and Telecom Conference. Also at the December 1, 2016 Credit Suisse Technology, Media, and Telecom Conference., Rosenberger confirmed a contract with Verizon. Further, on the fourth quarter 2014 earnings call, Rosenberger and Waldis participated with Waldis stating that "in the fourth quarter and the first

few weeks of 2015, we've executed on a number of exciting opportunities, including signing a substantial expansion of our contract with Verizon Wireless."

144.    Further, Synchronoss adopted controls and procedures governing its processes for accounts receivable and revenue recognition. In 2015, these policies were put in a document which it referred to as the 2015 Revenue Policy. This policy stated that it abided by the Sarbanes-Oxley Act of 2002 ("SOX"). The 2015 Revenue Policy required that contracts were to be signed by both parties prior to recognizing revenue. The 2015 Revenue Policy demonstrated that top management of the Company were involved in the process of contract execution.

145.    Moreover, in 2016 the Company established procedures which were also adopted pursuant to SOX which further confirmed that the Company had a customary business practice of using written contracts and that Waldis and Rosenberger were directly involved in the Company's finalization and execution of customer contracts. This "Transactional Revenue Process" states that "[r]evenues are based on a contractual price per transaction," making clear that contracts are prerequisite to revenue recognition. The Transactional Revenue Process states that, "[f]or all transactional revenue recorded greater than $500,000 for any given quarter, AR team prepares a technical memo to consider revenue recognition criteria in accordance with ASC 605-25, Revenue Recognition – Software." The Transactional Revenue Process described the Company's internal controls and procedures.

146.    Synchronoss also had a Accounts Receivable-Revenue Recognition Risk Control Matrix for 2016 (the "2016 RCM") which was an extensive spreadsheet setting forth internal controls relating to Synchronoss' accounting.

147.    According to several witnesses identified in the Second Amended Class Action Complaint and Demand for Jury Trial filed on August 14, 2019 as docket number 81 in the Securities Class Action (the "Securities Class  Action Complaint"), Synchronoss had a policy that contracts had to be signed to recognize revenue. This included CW7, a Synchronoss Internal Controls Manager, CW4, a financial analysist, CW5, a director of sales, and CW8, who worked on deals with customers.

148.    Despite the requirement to have contracts signed before recognizing revenue, the Company abandoned this practice, in contravention of GAAP, and recorded premature revenue by recognizing certain deals as completed before the contracts were signed.

149.    For instance, there were at least two instances that Synchronoss recognized revenues from deals with Verizon before they contracts were signed.

150.    On the November 7, 2016 earnings call, Defendant Wallis announced that Synchronoss "signed a 25 million license deal with Verizon during the quarter." Defendant Rosenberger confirmed during the same call that "our cloud business has hit an inflection point, as our previously stated strategic initiatives at Verizon on the Personal Cloud front enabled us to further expand our addressable market at this key customer with a $25 million license deal signed and recognized in the quarter."

151.    According to former Company accountant as identified in the Securities Class Action as CW3, Defendants Waldis and Rosenberger, and other Synchronoss executives, instructed the Company's accounting staff to manipulate the Company's financial results for reporting purposes, including bypassing Synchronoss' revenue recognition procedures and other internal controls for the express purpose of falsely meeting earnings guidance. In particular, the

"infamous" $25 million transaction with Verizon was booked as revenue without proper substantiation over the extreme objections of Company accountants and members of the accounting team. Defendant Rosenberger overruled these objections.

152. Further, Defendant Rosenberger "never really relinquished her control" over the accounting function and that Rosenberger "micromanaged" the Company's accountants.

153. Before being Synchronoss' CFO, Rosenberger, a licensed CPA, was the Company's Chief Accounting Officer (January 2012 to April 2014) and before that, was the Company's controller (December 2000 to January 2014). Rosenberger was responsible for reviewing supporting documentation for revenue and determining whether the documentation was sufficient for the Company to recognize the revenue.

154. The Verizon contract was not signed at the time the Company recorded the revenue in the third quarter of 2016. Defendant Rosenberger instructed accountants at Synchronoss to book this revenue despite the objections from the accounting department.

155. Including the $25 million Verizon license deal allowed Synchronoss to report substantial growth in the third quarter of 2016. The Company reported $101.9 million in Cloud Services revenue and $176.4 million in total revenue that quarter. Without including the Verizon deal, Cloud Services revenue would actually be $76.9 million and total revenue would have been $151.4 million. This would have shown there was no growth in Cloud Services revenue for the third quarter of 2015, the previous year. The Individual Defendants caused the Company to improperly book revenue from the Verizon contract to maintain artificially inflated Cloud Services and total revenue growth.

156.     Synchronoss also improperly recorded revenue from another unsigned contract with Verizon. According to the Securities Class Action Complaint, a CPA and certified fraud examiner as well as a financial analyst previously employed at Synchronoss, identified as CW1, confirmed that the Company improperly and prematurely recognized $5 million in cloud software licensing revenue derived from an agreement with Verizon in the first quarter of 2016. No such agreement, however, was signed in that quarter.

157.     The topic of getting another contract with Verizon, this one for $5 million, signed was discussed at weekly meetings. At these meetings, Defendant Rosenberger was aware that it had not been signed in the first quarter of 2016. Moreover, she was very involved in the Company's revenue recognition.

158.     Recognizing this $5 million revenue enabled Synchronoss to report Cloud Services revenues exceeding its first quarter 2016 guidance and bolstered the purported growth of the segment to inflate the Company's stock price.

159.     Additionally, Synchronoss, under Rosenberger's watch, improperly recognized revenue with a deals with AT&T, including by booking revenues in 2015 for revenues that never occurred.

160.     As alleged in the Securities Class Action Complaint, Synchronoss booked $7 million in revenue with two transactions with AT&T in late 2015. This allowed Synchronoss to falsely meet its fourth quarter 2015 guidance. According to CW2, a manager dedicated to overseeing recognition from revenue from the Securities Class Action, he was expressly asked by Company management in February 2016 to find a way to retroactively justify the revenue numbers that had already been reported in 2015.

161.    CW6, a former McKinsey & Company associate assigned to Synchronoss and later a Company employee, in the Securities Class Action even estimated that as much as 50% of the deals reported as completion lacked substantiation. This included the series of deals with AT&T totaling about $7 million for which no evidence existed that AT&T had agreed to the deals. Similarly, CW6 said purported deals with Spring in 2016 and 2017 lacked documentation that amounted to between $2 million and $5 million.

162.    Synchronoss received the SEC Letter dated September 2, 2016 questioning the Company's revenues from AT&T and Verizon, its largest customers. The SEC Letter requested Synchronoss publicly disclose its contracts with Verizon as exhibits to future filings. Synchronoss refused to attach the contracts that the SEC requested. Responding on September 16, 2016 to the SEC, the Company stated that "it does not believe that any individual contract between it and Verizon is one upon which the Company's business is substantially dependent."

163.    On September 22, 2016, the SEC responded requesting further information of the Company's contracts with Verizon. The Company responded on October 4, 2016, again declining to attach any contracts. The Company's response spoke volumes because if the Verizon contracts had been publicly available, Defendants' fraud would have been exposed as it would be known that the contracts were not signed when the Company reported revenue.

164.    In connection with the Restatement (defined below), Synchronoss did an "about face" on its prior position that no individual contract with Verizon was material such that Synchronoss did not need to attach it to SEC filings, as the SEC had instructed in 2016. In its Form 10-Q for the first quarter of 2018, filed with the SEC on July 2, 2018, Synchronoss disclosed that it had amended the terms of Statement of Work No. 1 under the Application

Service Provider Agreement between Synchronoss and Verizon dated April 1, 2013, and attached this contract with Verizon to the Form 10-Q.

165.     In addition to improper revenue recognition, Synchronoss has a system of manipulating expenses and other financial metrics in order to meet certain targets. This was known as the "flash file" which was prepared by Synchronoss financial analyst Andrew Latyszonek ("Latyszonek"). The flash file was shared with Defendants Rosenberger and Waldis on a weekly basis (from at least 2015 through 2016) and Latyszonek would obtain Rosenberger's express authorization in writing to make desired adjustments.

166.     According to the Securities Class Action Complaint, the flash file was used to determine with expenses should be buried or removed "down the line" so to show attractive, but false, margins in the Company's financial reports.

167.     CW3 in the Securities Class Action's complaint, had access to the information that was used to compare the "adjusted" figures that were publicly reported with the accurate figures. CW3 confirmed that Defendant Rosenberger approved, massaged, reclassified, or otherwise manipulated these figures. The accounting manipulations would be "adjusted" to show positive growth and improved margins.

**Joint Ventures**

168.     In late 2015, Synchronoss formed two joint ventures ("JVs") to expand its position in the cloud technology market. In November 2015, the Company formed SNCR, LLC, a joint venture with Goldman Sachs, and in December 2015 formed Zentry, LLC ("Zentry"), a joint venture with Verizon.

169. SNCR, LLC was formed to develop "advanced mobile solutions leveraging proprietary secure enterprise mobility technology" contributed by Goldman Sachs SNCR, LLC as well as Synchronoss' WorkSpace platform. Synchronoss obtained a 67% interest in SNCR, LLC in exchange for a perpetual license for the use of the WorkSpace platform. Goldman Sachs obtained a put option to sell its share of SNCR, LLC to Synchronoss, and Synchronoss obtained a call option to require Goldman Sachs to sell its share of SNCR, LLC to Synchronoss. Goldman Sachs has a "redeemable non-controlling interest" in SNCR, LLC. SNCR, LLC is a variable interest entity ("VIE"), of which Synchronoss is the primary beneficiary.

170. Zentry was formed to develop and manage a secure mobile user identification and authentication platform. Synchronoss provided $48 million to obtain a 67% interest in Zentry. Verizon, the co-venturer in Zentry, obtained a put option to sell its share of Zentry to Synchronoss after December 2018, and Synchronoss obtained a call option to require Verizon to sell its share of Zentry to Synchronoss after December 31, 2018.

171. On December 31, 2015, Zentry entered into a $23 million perpetual license agreement with a Verizon subsidiary for the use of certain Verizon user authentication software.

172. In the Restatement (defined herein), the Company acknowledged that it treated the $23 million licensing fee as revenue in the fourth quarter of 2015. Recognition of the licensing fee as standalone revenue, rather than as part of the accounting as part of the formation of the JV, was a blatant violation of GAAP.

**Materially False and Misleading Statements Issued During the Relevant Period**

173. October 28, 2014, the Company issued a press release announcing its financial results for the third quarter of 2014. In the press release, Defendant Waldis stated:

- 52 -

Synchronoss' strong third quarter financial results exceeded our expectations from a revenue and profitability perspective and were highlighted by 115% year-over-year Cloud Services revenue growth.

174.    Defendant Rosenberger was quoted in this press release stating: "[W]e continue to generate both meaningful growth and sustained profitability."

175.    The press release also stated the following as to revenues:

On a GAAP basis, Synchronoss reported net revenues of $125.2 million, representing an increase of 40% compared to the third quarter of 2013. Gross profit was $74.7 million and income from operations was $15.6 million in the quarter. Net income applicable to common stock was $9.3 million, leading to diluted earnings per share of $0.22, compared to $0.09 for the third quarter of 2013.

*          *          *

Cloud Services non-GAAP revenue was $57.9 million, representing approximately 46% of total revenue.

176.    On the third quarter 2014 earnings call, held on October 28, 2014, Defendant Rosenberger stated: "Our non-GAAP Cloud Services revenue in the third quarter was $57.9 million representing 46% of our total revenue and year-over-year growth of 115%." Defendant Waldis stated: "Our strong third quarter results were highlighted by the significant outperformance in our cloud services business, which generated year-over-year revenue growth of 115%."

177.    In its Form 10-Q for the quarter ended September 30, 2014, which was signed by Defendants Waldis and Rosenberger on October 31, 2014, and filed with the SEC on October 31, 2014 (the "3Q14 10-Q"), Synchronoss reported net revenue of $125.175 million and income from operations of $15.618 million. Synchronoss reported net revenue of $457.314 million and income from operations of $62.298 million for the year-to-date 2014 period. The 3Q14 10-Q also states: "[O]ur consolidated financial statements . . . have been prepared in accordance with

GAAP." Attached to the 3Q14 10-Q were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the SOX signed by Defendants Waldis and Rosenberger attesting to the accuracy of the 3Q14 10-Q.

178.    Under the heading "Changes in internal controls over financial reporting," the 3Q14 10-Q also stated: "We have implemented new financial systems that will continue in phases over the reminder of the year. In connection with this initiative and the resulting changes in our financial systems, the Company continues to enhance the design and documentations of our internal control processes to ensure that controls over our financial reporting remain effective."

179.    The Company announced its fourth quarter 2014 and full-year 2014 financial results on February 5, 2015. The Company's press release highlighted "year-over-year Cloud Services revenue growth of 61%," and reported revenues "[o]n a GAAP basis" of "$130.2 million, representing an increase of 34% compared to the fourth quarter of 2013." The press release further reported gross profits of $77.6 million, income from operations of $20.5 million, net income of $13.6 million, and diluted earnings per share of $0.30 for the fourth quarter of 2014 compared to $0.39 for the fourth quarter of 2013, all on a GAAP basis. The press release also states that Cloud Services non-GAAP revenue was $63.4 million, "representing approximately 48% of total non-GAAP revenue and growing 61% on a year-over-year basis." On the Company's February 5, 2015 earnings call, Defendant Rosenberger stated: "Our non-GAAP Cloud Services revenue in the fourth quarter was $63.4 million, which represented 48% of our total revenue and year-over-year growth of 61%."

180.    In its Form 10-K for the year ended December 31, 2014, which was signed by Defendants Waldis, Rosenberger, Cadogan, Hoffman, Hopkins, McCormick, and Moore on February 25, 2015, and filed with the SEC on February 25, 2015 (the "2014 10-K"), Synchronoss reported net revenue of $457.314 million and income from operations of $62.298 million. Attached to the 2016 10-K were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the SOX signed by Defendants Waldis and Rosenberger attesting to the accuracy of the 2014 10-K. The 2014 10-K also stated: "our consolidated financial statements . . . have been prepared in accordance with U.S. GAAP."

181.    The 2014 10-K stated the following as to revenue:

Revenue from software license arrangements is recognized when the license is delivered to our customers and all of the software revenue recognition criteria are met. When software arrangements include multiple elements, the arrangement consideration is allocated at the inception to all deliverables using the residual method providing we have vendor specific objective evidence (VSOE) on all undelivered elements. We determine VSOE for each element based on historical stand-alone sales to third-parties.

*       *       *

[W]e follow specific and detailed rules and guidelines related to revenue recognition

182.    The Company announced its first quarter 2015 financial results on April 29, 2015. The Company's press release touted "63% year-over-year" growth in Cloud Services," and reported revenues "[o]n a GAAP basis" of "$132.9 million, representing an increase of 35% compared to the first quarter of 2014." The press release further reported gross profits of $79.3 million, income from operations of $18.3 million, net income of $10.6 million, and diluted earnings per share of $0.23 for the first quarter of 2015 compared to $0.19 for the first quarter of

2014, all on a GAAP basis. The press release also stated: "Cloud Services revenue of $71.3 million increases 63% year-over-year." The press release also quoted Defendant Waldis as stating: "During the quarter, both sides of our business contributed to the strong performance, particularly our Cloud Services, which grew by 63% year-over-year. Mobile Operators around the world are capitalizing on the success of how personal cloud can drive important benefits to their valuable subscribers. We are pleased with our successful formula for helping our customers gain adoption and success with our personal cloud platform."

183.    On the Company's April 29, 2015 earnings call, Defendant Rosenberger stated: "Our non-GAAP cloud revenue in the first quarter was $71.3 million, which represented 54% of our total revenue and year-over-year growth of 63%."

184.    In its Form 10-Q for the quarter ended March 31, 2015, which was signed by Defendants Waldis and Rosenberger on May 1, 2015, and filed with the SEC on May 1, 2015 (the "1Q15 10-Q"), Synchronoss reported net revenue of $132.926 million and income from operations of $18.289 million. Attached to the 1Q15 10-Q were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the SOX signed by Defendants Waldis and Rosenberger attesting to the accuracy the 1Q15 10-Q. The 1Q15 10-Q also stated: "our consolidated financial statements . . . have been prepared in accordance with GAAP." The 1Q15 10-Q incorporated the following by reference:

> Revenue from software license arrangements is recognized when the license is delivered to our customers and all of the software revenue recognition criteria are met. When software arrangements include multiple elements, the arrangement consideration is allocated at the inception to all deliverables using the residual method providing we have vendor specific objective evidence (VSOE) on all undelivered elements. We determine VSOE for each element based on historical stand-alone sales to third-parties.

- 56 -

*      *      *

[W]e follow specific and detailed rules and guidelines related to revenue recognition

185.    Under the heading "Changes in internal controls over financial reporting," the 1Q15 10-Q also stated: "We have implemented new financial systems that will continue in phases over the reminder of the year. In connection with this initiative and the resulting changes in our financial systems, the Company continues to enhance the design and documentations of our internal control processes to ensure that controls over our financial reporting remain effective."

186.    The Company announced its second quarter 2015 financial results on July 29, 2015. The Company's press release reported revenues "[o]n a GAAP basis" of "$137.8 million, representing an increase of 33% compared to the second quarter of 2014." The press release further reported gross profits of $82.9 million, income from operations of $23.6 million, net income of $15.2 million, and diluted earnings per share of $0.33 for the second quarter of 2015 compared to $0.20 for the second quarter of 2014, all on a GAAP basis. The press release also stated: "Cloud Services revenue of $71.9 million increases 54% year-over-year." The press release also quoted Defendant Waldis as stating: "Each of our businesses performed well in the quarter and we were pleased to see some of our new wins begin to scale and drive volumes, particularly on the cloud side. We are gaining strong traction among international mobile operators who are increasingly realizing the significant value Synchronoss' white-label cloud solution can deliver to their subscribers."

187.    On the Company's July 29, 2015 earnings call, Defendant Rosenberger stated: "Our non-GAAP cloud services revenue in the second quarter was $71.9 million which represented 52% of our total revenue and year-over-year growth of 54%."

188.    In its Form 10-Q for the quarter ended June 30, 2015, which was signed by Defendants Waldis and Rosenberger on July 31, 2015, and filed with the SEC on July 31, 2015 (the "2Q15 10-Q"), Synchronoss reported net revenue of $137.820 million and income from operations of $23.638 million. The 2Q15 10-Q also states: "our consolidated financial statements . . . have been prepared in accordance with GAAP." Attached to the 2Q15 10-Q were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the SOX signed by Defendants Waldis and Rosenberger attesting to the accuracy of the 2Q15 10-Q. The 2Q15 10-Q incorporated the following by reference:

> Revenue from software license arrangements is recognized when the license is delivered to our customers and all of the software revenue recognition criteria are met. When software arrangements include multiple elements, the arrangement consideration is allocated at the inception to all deliverables using the residual method providing we have vendor specific objective evidence (VSOE) on all undelivered elements. We determine VSOE for each element based on historical stand-alone sales to third-parties.
>
> *        *        *
>
> [W]e follow specific and detailed rules and guidelines related to revenue recognition

189.    On October 28, 2015, the Company issued a press release announcing its financial results for the quarter ended September 30, 2016, in which Defendant Waldis touted the financial prospects of the Company, stating that Synchronoss has "significantly expanded [its] addressable market with the launch of [its] enterprise business and the Synchronoss Secure Mobility Suite"

and that the adoption of the Company's "cloud and activation platforms continues to grow globally." Defendant Rosenberger also discussed the Company's purportedly strong financial position, noting that "strategic customer relationships, combined with our growth investments and expansion into new market opportunities, position us well to scale Synchronoss to the next level and generate greater shareholder value over time."

190.    On the Company's October 28, 2015 earnings call, Defendant Rosenberger stated: "Our non-GAAP cloud services revenue was $76.1 million, which represented just over 50% of our total revenue and year-over-year growth of 31%."

191.    In its Form 10-Q for the quarter ended September 30, 2015, which was signed by Defendants Waldis and Rosenberger on November 5, 2015, and filed with the SEC on November 5, 2015 ("3Q15 10-Q"), Synchronoss reported net revenue of $150.874 million and income from operations of $22.294 million. 3Q15 10-Q at page 4. The 3Q15 10-Q also states: "our consolidated financial statements . . . have been prepared in accordance with GAAP." Attached to the 3Q15 10-Q were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the SOX signed by Defendants Waldis and Rosenberger attesting to the accuracy of the 3Q15 10-Q.

192.    On February 3, 2016, the Company issued a press release announcing its financial results for the quarter and year ended December 31, 2015, reporting $157.8 million in revenue for the fourth quarter, which was a 21% increase year-over-year. For the quarter, the press release additionally reported earnings per share at $0.61, a 16% increase year-over-year, and Cloud Services revenue at $90.9 million, a 43% increase year-over-year.  In the press release, Defendant Waldis touted the Company's Cloud Services business, stating that the "Cloud

Services business continues to perform, well, driven by increasing subscriber adoption across our expanding customer base." Defendant Rosenberger commented positively on the Company's prospects, stating that the Company's investments in the year 2015 position Synchronoss "to generate significant value for our shareholders."

193.    On the Company's February 3, 2016 earnings call, Defendant Rosenberger stated: "Our non-GAAP Cloud Services revenue in the fourth quarter was $90.9 million, which represented 58% of our total revenue and year-over-year growth of 43%."

194.    On February 4, 2016, the Company issued a press release announcing a $100 million share repurchase program, noting that "Synchronoss has a very strong market position and financial profile, in addition to a large and expanding addressable market opportunity."  In the press release, Defendant Waldis stated that, "[w]e expect to deliver an attractive combination of solid top line growth, strong profit margins and expanding free cash flow.  In addition, we are making important investments in our enterprise business, including our ventures with Goldman Sachs and Verizon, that we believe will enhance our long-term growth and profitability profile."

195.    In its Form 10-K for the year ended December 31, 2015, which was signed by Defendants Waldis, Rosenberger, Cadogan, Hoffman, Hopkins, McCormick, and Moore on February 26, 2016, and filed with the SEC on February 26, 2016 (the "2015 10-K"), Synchronoss reported net revenue of $578.831 million and income from operations of $79.590 million. Attached to the 2015 10-K were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the SOX signed by Defendants Waldis and Rosenberger attesting to the accuracy of the 2015 10-K. The 2015 10-K also stated: "our consolidated financial

statements . . . have been prepared in accordance with U.S. GAAP." The 10-K also discussed

revenue from software licensing stating in part:

> Revenue from software license arrangements is recognized when the license is
> delivered to our customers and all of the software revenue recognition criteria are
> met. When software arrangements include multiple elements, the arrangement
> consideration is allocated at the inception to all deliverables using the residual
> method providing we have vendor specific objective evidence (VSOE) on all
> undelivered elements. We determine VSOE for each element based on historical
> stand-alone sales to third-parties.

196.    On April 7, 2016, the Company filed a Schedule 14A with the SEC (the "2016

Proxy Statement").  The 2016 Proxy Statement touted the Company's "record financial results"

in 2015 and the future prospects of the Company.  However, the 2016 Proxy Statement failed to

disclose that: (1) an existing vendor (Sequential) had purchased the Company's activation

business, and this existing vendor had been owned by Defendant Waldis and other members of

the Company's senior management; (2) Omniglobe owns Sequential, and 50% of Omniglobe is

owned by family and friends of the Company; (3) Sequential's current owner and Chairman is a

related party with several ties to Defendant Waldis and the Company; (4) there was a prior and

existing relationship between Sequential and the Company; (5) a $9.2 million license agreement

between the Company and Sequential was entered into for the lone purpose of artificially

inflating the Company's financials; (6) the Company acquired Intralinks and misrepresented its

future growth metrics due to the issues facing the Company's cloud computing business since

2015; (7) the newly-acquired Intralinks was underperforming; (8) the Company's integration of

other acquisitions was underperforming; (9) the Company was facing serious hurdles integrating,

and capitalizing on, its newly acquired companies; (10) as such, the Company's guidance was

overstated; (11) the Company improperly recognized revenue; (12) the Company manipulated

the figures and metrics in its financial statements; (13) the Company's financial statements were not prepared in accordance with GAAP; (15) the Company failed to maintain internal controls; and (16) as a result of the foregoing, Defendants' statements about Synchronoss' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

197.    On May 5, 2016, the Company issued a press release announcing "strong first quarter" results for the quarter ended March 31, 2016. Specifically, the Company stated that "[c]loud services were robust this quarter, as increasing subscriber growth on our core customer base is laying the groundwork for incremental cloud opportunities both domestically and internationally over the next 12 to 18 months."

198.    On the Company's May 5, 2016 earnings call, Defendant Rosenberger stated: "Our cloud services revenue in the first quarter was $84.3 million, which represented 58% of our total revenue and grew 18% year-over-year, exceeding both Street and internal expectations.

199.    On May 10, 2016, the Company filed with the SEC its quarterly report for the quarter ended March 31, 2016 on a Form 10-Q signed by Defendants Waldis and Rosenberger ("1Q16 10-Q").   This quarterly report reaffirmed the purported "strong financial results" announced in the Company's press release issued on May 5, 2016. Attached to the 1Q16 10-Q were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and SOX certifications signed by Defendants Waldis and Rosenberger attesting to the accuracy of the 1Q16 10-Q.

200.    On August 3, 2016, the Company issued a press release announcing "strong second quarter" results for the quarter ended June 30, 2016.  Specifically, the Company stated that "Cloud was strong this quarter, as solid subscriber growth in our core customer base is

setting the stage for incremental cloud opportunities while investments in the enterprise initiatives are already generating significant customer activity in the field."

201.    On an August 3, 2016 earnings call, Defendant Rosenberger stated: "Now let me move to guidance for the third quarter and an update on our 2016 outlook. Non-GAAP revenues are expected to be in the range of $175 million to $180 million, representing year-over-year growth of approximately 17% at the midpoint."

202.    On August 4, 2016, the Company filed with the SEC its quarterly report for the quarter ended June 30, 2016 on a Form 10-Q signed by Defendants Waldis and Rosenberger ("2Q16 10-Q").   This quarterly report reaffirmed the purported "strong financial results" announced in the Company's press release issued on August 3, 2016.  Attached to the 2Q16 10-Q were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the SOX signed by Defendants Waldis and Rosenberger attesting to the accuracy of the 2Q16 10-Q.

203.    On November 7, 2016, Synchronoss issued the press release, "Synchronoss Technologies, Inc. Announces Strong Third Quarter Results." The press release contained misleading financial results for the third quarter of 2016, stating in part:

> **Total Revenue:** $176.4 million GAAP compared to $150.9 million in the third quarter of 2015. $181.0 million non-GAAP compared to $151.3 million in the third quarter of 2015
>
> *       *       *
>
> **Cloud Solution revenue**: $101.9 million of GAAP revenue, representing approximately 58% of total GAAP revenues and growing 34% on a year-over-year basis. $106.4 million of non-GAAP revenue, representing approximately 59% of total non-GAAP revenue and growing 40% year-over-year.

204.    On November 7, 2016, the Company issued a press release announcing "strong third quarter" results for the quarter ended September 30, 2016. Specifically, the Company stated

that "Cloud was very strong this quarter with both new and existing customers, as solid subscriber growth and expanded cloud initiatives in our core customer base set the stage for the next chapter of growth at Synchronoss."

205.    Also on November 7, 2016, the Company also held an earnings call discussing its financial results for the quarter ended September 30, 2016, in which the Company announced that it would "evaluate strategic alternatives" for its activation business in an effort to enhance shareholder value.  Defendant Waldis stated, in relevant part:

> So, we're obviously in the process of evaluating opportunities in the activation world. Clearly, there are good pockets of strength, certainly in analytics, certainly in some of the new emerging areas, Internet of Things. But there has been obviously areas or facets that have slowed down as you guys have seen in the market today. And so, when you look and compare that to both our cloud and enterprise business that have both high growth trajectories and margin profile significantly better than the activation business, we want to make sure that as we evaluate the process that we're doing everything we can to ensure we're making the investments in the high-growth, high margin businesses of the future. And that's something that will play out over the next quarter or so, and as we'd mentioned we'll certainly keep everybody up to speed.

206.    On November 8, 2016, the Company filed with the SEC its quarterly report for the quarter ended September 30, 2016 on a Form 10-Q signed by Defendants Waldis and Rosenberger ("3Q16 10-Q").  This quarterly report reaffirmed the purported "strong financial results" announced in the Company's press release issued on November 7, 2016.  Attached to the 3Q16 10-Q were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the SOX signed by Defendants Waldis and Rosenberger attesting to the accuracy of the 3Q16 10-Q. In the 3Q16 10-Q, Synchronoss reported net revenue of $176.421 million and income from operations of $13.209 million.

207.    The 3Q16 10-Q and associated Form 8-K also report revenues for the "Nine Months Ended September 30, 2016" as $476,658,000, incorporating false revenue figures from

the first quarter of 2016. The 3Q16 10-Q also states: "our consolidated financial statements . . . .have been prepared in accordance with GAAP."

208.    On December 6, 2016, the Company issued a press release announcing its planned acquisition of Intralinks, stating that the Company had "entered into a definitive agreement for Synchronoss to acquire Intralinks for approximately $821 million in equity value." This was almost twice its then share price. The acquisition was funded by proceeds from the Sequential transaction and $900 million in new debt.

209.    On the Company's December 6, 2016 call to discuss the Intralinks acquisition, Defendant Rosenberger stated: "For the combined company following the proposed Intralinks acquisition, we are giving initial 2017 total revenue guidance of between $810 million to $820 million and pro forma EPS of between $2.45 and $2.60 assuming a late first quarter close on the Intralinks transaction and factoring in the expected impact from our new debt facility."

210.    The press release provided inflated guidance for 2017 as follows: "With the impact from the Sequential Technology divestiture and assuming a late first quarter 2017 close on the Intralinks deal, Synchronoss is giving initial 2017 revenue guidance of between $810 million and $820 million with pro forma EPS of between $2.45 and $2.60 for the combined entity." The Company also announced that "[Defendant] Hovsepian, Chief Executive Officer of Intralinks, is expected to be appointed Chief Executive Officer of Synchronoss and join the Synchronoss Board of Directors" after the acquisition of Intralinks. Moreover, the press release depicted Intralinks as a very successful business entity, stating, in relevant part:

> In Intralinks' 20-year history, over 4.1 million business users across the world have used its secure, cloud-based platform, and it counts 99% of Fortune 1000 companies among its customers. To date, Intralinks has supported over $31

trillion in high-stakes transactions, making the company a leader in the enterprise content collaboration market.

"Intralinks has established itself as a household name in the financial services world over the past 20 years, with a keen focus on growing its presence into the next generation secure content collaboration market over the coming years," said Stephen Waldis, Synchronoss' CEO. "This acquisition marks another major step in the transformation of Synchronoss to significantly expand the scale and scope of the company's enterprise initiatives and strong carrier relationships in attacking this multi-billion dollar market opportunity.  [. . . ]."

*       *       *

"Our board of directors unanimously concluded that Synchronoss is the ideal strategic partner for Intralinks and also gives our employees and customers the opportunity to leverage Synchronoss' deep relationships across the carrier space, cloud expertise, and strong partnerships in the financial services vertical," said Ron Hovsepian, CEO of Intralinks. "Together with Synchronoss, we believe we can deploy enhanced enterprise and mobile solutions to our customers while opening up new enterprise distribution channels across the world."

211.     On December 6, 2016 the Company's filed a Form 8-K with the SEC ("December 6 8-K"). The December 6 8-K detailed that Synchronoss would divest 70% of its activation business to Sequential for a total purchase price of $146 million, and that the 30% ownership interest in the activation business that was retained by the Company could be reduced during 2017 as part of the transaction.

212.     The December 6 8-K discussed the divesture of the activation business, stating in part:

On December 5, 2016, Parent [Synchronoss] entered into a purchase and sale and amended and restated operating agreement (the "Operating Agreement") by and among Sequential Technology International, LLC ("STI"), Parent and Sequential Technology International Holdings, LLC ("Sequential") pursuant to which Parent sold a 70% interest (the "Divestiture") in STI to Sequential in return for a cash payment of $146 million to Parent.  Parent previously formed STI and contributed certain of its activation business assets to STI in return for its initial membership interest in STI.  As part of the transactions contemplated by the Divestiture,

- 66 -

Parent issued a promissory note to Sequential, which is secured by Sequential's interest in STI.  In addition, Parent is retaining a 30% interest in STI. Pursuant to the terms of the Operating Agreement, Parent has certain put rights whereby Sequential would be required to purchase Parent's interest in STI in certain circumstances and Sequential has a corresponding call right where Sequential would be required to purchase Parent's interest in STI in certain circumstances.

213.   Synchronoss did not reveal to investors that the new 70% partner in the activation business was the company formally known as Omniglobe. Synchronoss also failed to reveal that "friends and family" of Synchronoss are deeply involved with Omniglobe.

214.   Synchronoss investors were unfavorable towards this transaction as the Company's stock plummeted $6.41 per share, or over 13%, from the previous close of $49.00 on December 5, 2016.

215.   Synchronoss investors also suspected something untoward was happening at the Company regarding the divestiture of the Activation business. Indeed, a securities analyst, Tom M. Roderick of Stiel Nicolous & Company stated on December 19, 2016: "[P]lenty of questions about the Activation divestiture, starting with **'Who the heck is Sequential Technology???** Since the divestiture of the Activation business was first announced, we have been perplexed by our inability to learn much, if anything, about the buyer Sequential Technology International." Mr. Roderick continued, "we now understand [Sequential] to be a rebranding for the Philippine-based BPO Omniglobe International," but cited no source.

216.   On December 6, 2016, Synchronoss also issued the press release "Synchronoss Technologies to Acquire Intralinks Holdings Accelerating Strategic Transformation." Considering the divestiture of its Activision business and the acquisition of Intralinks, the press release provided "initial 2017 revenue guidance of between $810 million and $820 million with pro forma EPS of between $2.45 and $2.60 for the combined entity." Moreover, the press release

noted that the Company was "targeting $40 million of combined synergies within the first year of closing the Intralinks deal."

217.    On December 22, 2016, Syncrhonoss filed a Form 8-K announcing that on December 17, 2016, it had completed a divestiture of a portion of its Activation business, stating in part:

> On December 16, 2016, Synchronoss Technologies, Inc. ("Synchronoss") completed the previously announced divestiture of a portion of its carrier activation business ("BPO") to newly formed Sequential Technology International, LLC ("STI") for a total purchase price of $146 million (the "Sale"). As part of the Sale, Synchronoss will retain a 30% investment in STI, which can be reduced during the course of 2017. The historical financial results of the BPO business will be classified as discontinued operations in Synchronoss' future filings.

218.    Buried in the footnotes of the unaudited pro forma condensed consolidated financial statements, attached as an exhibit to the 8-K, was some originally undisclosed information. For instance, the $146 million figure of the transaction applied to 100% interest in the Activision business, not the 70% that Synchronoss previously represented. A footnote stated that the figure of $45.87 million reflected the 30% investment Synchronoss related in STI connection with the sale. Further, the footnotes revealed that the Company only got $100.3 million for a 65.6% interest in STI and the remaining 4.4% was accounted for by assets "contributed" by Sequential to STI. Moreover, of the $100.3 million, only $17.3 million of that was a cash distribution. The Company stated it "received a Sellers Note of approximately $83.0 million as part of the proceeds in connection with the Sale.."

219.    On January 5, 2017, the Company filed a Form 8-K/A with the SEC reiterating the several financial aspects of the Company's activation business divestiture to Sequential, including that it would initially net the Company only $17.3 million in cash and would include

an $83 million note receivable. The Form 8-K/A additionally provided financial statements depicting what the Company's financial position would be had the divestiture been completed, revealing that the Company will continue to bear costs associated with the activation business due to its remaining 30% ownership stake, such as corporate overhead, cost of services, and stock-based compensation. In providing the impact the divestiture would have on the Company's financial statements, the Form 8-K/A revealed specific terms of the divestiture agreement, including, among other things, that: (1) the $17.3 million payment "[r]epresents Synchronoss' cash distribution of approximately $17.3 million as part of the $100.3M consideration received in connection with the sale of 65.6%"; (2) Sequential contributed assets for the remaining 4.4% ownership; (3) "[a]pproximately $30 million has been set aside in escrow to cover certain conditions of the closing of the Sale . . . ."; (4) [i]n connection with the Sale, the billed receivables of the [activation business] were excluded from the transfer to [Sequential]; and (5) "Synchronoss received a Sellers Note of approximately $83.0 million as part of the proceeds in connection with the Sale, which can be reduced or paid back in full to Synchronoss during 2017."

220.   On January 5, 2017, the Company also filed a Form 8-K with the SEC with attached materials concerning its joint venture and three-year transition services agreement with Sequential. The exhibit to the Form 8-K noted that the Company's transaction with Sequential was structured as a joint-venture, and that the Company would retain a 30% ownership stake and contribute certain components of its carrier activation business, and that Sequential would own the remaining 70% of the joint venture and had agreed to finance "the purchase of these assets through cash, a new term loan, and a sellers note issued by Synchronoss."  It was noted that the

Company entered into the transition services agreement with Sequential in order to support various indirect activities stemming from the joint venture.   Further, the Company would receive an annual payment of approximately $32 million pursuant to the terms of the agreement. Sequential announced on January 12, 2017 that the transaction had closed.

221.   On February 8, 2017, the Company issued a press release announcing financial results for the fiscal quarter and year ended December 31, 2016, including non-GAAP combined total revenue of $147.8 million and non-GAAP earnings per share of $0.24 for the quarter. Specifically, the Company stated that it "has been an exciting time at Synchronoss over the past few months as we view the acquisition of Intralinks to be a major step forward in our enterprise strategy with [Defendant Hovsepian] leading the team to successfully integrate both companies into a single portfolio." Defendant Hovsepian added that the Company "has transformed its strategy with the Intralinks acquisition and divestiture of its traditional activation business as the company now looks to expand the scale and scope of its enterprise and cloud initiatives to drive the new SNCR 3.0 vision."

222.   On February 8, 2017, the Company held a conference call to discuss its financial results for the 2016 fiscal year. During this call, Defendant Rosenberger stated that, with the Intralinks transaction closed, "2017 non-GAAP revenues are expected to be in the range of $810 million to $820 million, unchanged from our initial guidance given on December 6 for the combined Company. On a normalized basis when adjusting for divestitures and the Intralinks acquisition, this would imply year-over-year growth of between 13% and 15%."   Defendant Rosenberger also stated that, for the first quarter of the 2017 fiscal year, the Company "expect[s] total revenues of between $173 million and $178 million…[w]e currently expect non-GAAP

gross margins of between 70% and 71% for the full year 2017." During the conference call, Defendant Rosenberger engaged in an exchange with an analyst concerning the payments the Company expected to receive from Sequential as part of the Company's divestiture of part of its activation business, which was as follows:

[Tavis C. McCourt]

Okay. And then, just some details on the Sequential sale. So, can you give us a sense of the size of the revenues that you will be generating from Sequential for providing them services during the transition period and maybe the margins on those revenues and kind of the timing of when you would expect them to go away?

[Defendant Rosenberger]

Yeah. So, I can give you some information on that, Tavis. I think as we went through the transaction, we talked about the fact that we were going to provide ongoing services for a three-year term to Sequential Technology and, obviously, contractual around $30 million in revenue per year over the next three years associated with those services. As far as margins, et cetera, we don't give those details, but it's clearly consistent with our mix of business.

223.    During the February 8, 2017 earnings call, analyst Samad Samana from Stephens, Inc. asked Defendant Waldis:

The Verizon, the $25 million payment that was announced last quarter. We have been told that, that is a new product or a new initiative. Is that separate from what you're talking about at Mobile World Congress on the analytics side, or is that the same announcement? Maybe help us understand that?

Defendant Waldis responded: "Two different things. The Verizon opportunity is relationship that you will hear more about in Q1 [of 2017] that is not publicly announced."

224.    The Company never provided more details about the "Verizon opportunity" because it was a phantom contract for which the Company lacked substantiation. Defendant

Waldis failed to disclose the improper accounting treatment of the $25 million licensing fee with Verizon, despite responding to a question from an analyst about the Verizon licensing fee.

225.   During the February 8, 2017 conference call, Defendant Rosenberg revealed additional information on the payments the Company was to receive from Sequential as part of its divestiture agreement in an exchange with two more analysts, which was as follows:

[Tom Roderick]

Got it. I think I got it. And then this maybe related to your commentary on the ongoing piece, but just so I understand what that piece is. Because I know you were sort of highlighting – you guys were highlighting in the calculation around the financing documents that service agreement, which probably is what you're referring to with Sequential. But can you talk a little bit more about what that agreement is? How you're still supporting them as a partner? And will all of that revenue then flow into continuing ops going forward? Or is that $32 million annual agreement, is that all just thrown into discontinuing ops, so we won't have to worry about it?

[Defendant Rosenberger]

Actually, that will be part of continuing operations. And if you want to think about the services that we provide for Sequential, remember the fact that we had software revenues associated with some of that activation business in that analytics area. And that particular IP was obviously kept by Synchronoss and Synchronoss will be providing services around that.

\*       \*       \*

[Samad Samana]

Hi. I actually wanted to follow-up on the $32 million payment. I'm curious, so when you gave the original $520 million of cloud revenue guidance for calendar 2017, did that assume the $32 million services agreement or how much of this analytics revenue that's now being put into cloud was previously in activation? I guess, I'm just trying to bridge, the math of guidance didn't change, but there is this $32 million payment now that you're getting. Help me understand where that was classified before or where you thought that would be classified into?

[Defendant Rosenberger]

No, this is new analytics revenue as we talked about. Clearly, the $32 million is part of a TSA arrangement, but it is all around the analytics.

**The Truth Begins to Emerge**

226.    On February 24, 2017, the SIRF published a report titled "Synchronoss Technologies: The Friends and Family Plan," which accused Synchronoss of concealing key aspects of its Intralinks and Sequential deals.  Per the report, Sequential and Omniglobe are one and the same.  The related-party relationship between Omniglobe and the Company was first disclosed in February 2006, at which time many of the current and former executives and directors of the Company, including Defendant Waldis, held ownership stakes in Omniglobe.  A 50% stakeholder in Omniglobe, Jaswinder Matharu, stated to the SIRF that 50% of Omniglobe is currently "owned by friends and family of Synchronoss."  Such ownership interests, however, were not disclosed to the investing public.  The report stated, in relevant part:

> The Sequential Technology International portrayed in the company's conference calls and press releases sounds like a standard corporate buyer, chosen after some consideration among a number of different options.
>
> That's not remotely the case.
>
> To start, the Southern Investigative Reporting Foundation could not locate STI in any corporate registry or database — it's a corporate shell, formed in early November, 2016 whose website was registered by John Methfessel, a former neighbor of Stephen Waldis and an early-stage Synchronoss investor.
>
> *       *       *
>
> So what is Omniglobe International?
>
> It's a business process outsourcing company (often abbreviated to "BPO") that handles non-essential tasks for Synchronoss' Activation unit. Specifically, through offices in the Philippines and India, Omniglobe provides phone activation customer service for Synchronoss' AT&T contract.

In its June 2006 initial public offering prospectus, Synchronoss disclosed that Omniglobe was a related party, a legal term of art that in this case means that four of its officers had an investment in Omniglobe, and would benefit financially from doing business with it. (As detailed on page 74 of the prospectus, then-CEO Waldis had a 12.23 percent "indirect equity interest in Omniglobe," former chief financial officer Lawrence Irving and former chief technology officer David Berry both had 2.58 percent and current president and chief operating officer Robert Garcia had 1.29 percent.)

227.    On this news, the price per share of Synchronoss stock at closing fell $0.37, or 1.1%, from the previous day's closing price to close at $30.49 per share on February 24, 2017.

228.    On February 27, 2017, the Company filed with the SEC the 2016 10-K which was signed by Defendants Waldis, Rosenberger, Hovsepian, Cadogan, Hopkins, McCormick, and Moore. The 2016 10-K reaffirmed the financial results announced in the Company's press release issued on February 8, 2017. Attached to the 2016 10-K were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the SOX signed by Defendants Waldis and Rosenberger attesting to the accuracy of the 2016 10-K.

229.    The 2016 10-K also revealed that on December 22, 2016, the Company had "entered into a non-exclusive perpetual license agreement with [Sequential Technology International Holdings, LLC (which owns 70% of Sequential)], in the amount of $9.2 million, which is included in net revenues in the statement of income, for the use of the Company's Analytics software." Oddly, this $9.2 million software license was not mentioned in the February 8, 2017 earnings call the Company held, despite Company management being asked numerous questions regarding payments the Company received from Sequential.

230.    The 2016 10-K stated that Synchronoss "reclassified revenue historically derived from Cloud Analytics offering to the Cloud category."

231.    The $9.2 million fee was a considerable help to Synchronoss' Cloud segment revenue and profit margin, also providing for a vast majority of the Company's overall profits and earnings per share. The inclusion of the $9.2 million in revenue allowed Synchronoss to meet its guidance for Cloud revenue as on the December 6, 2016 earnings call, Synchronoss' Rosenberger stated: "Our cloud revenue in the fourth quarter is on track to be slightly ahead of our initial guidance of between $122 million and $125 million."

232.    When Synchronoss initially announced the fourth quarter of 2016 results in the February 8, 2017 press release, the Company said that revenue came in right on target. The press release did not mention the $9.2 million or the perpetual license agreement. The February 8, 2017 press release stated in part" GAAP Cloud Services revenue from continuing operations accounted for $121.7 million in the fourth quarter. Non-GAAP Cloud Services revenue from continuing operations accounted for $123.9 million in the fourth quarter. This was led by cloud deployments at new and existing customers."

233.    During the February 8, 2017 earnings call regarding the fourth quarter of 2016, Synchronoss executives were asked about revenues generated from the Activation divestiture, but there was no mention of the "perpetual license agreement" or the $9.2 million.

234.     On this news, the price per share of Synchronoss stock fell $1.80, or 5.9%, from the closing price the previous day the market was open to close at $28.69 per share on February 27, 2017.  By the close of market on February 28, 2017, the price per share of Company stock had fallen even more to $27.08.

235.    By not revealing to investors that the $9.2 million represented a one-time revenue rather than organic growth, Synchronoss misled investors into believe that Cloud Services growth was greater than it actually was.

236.    The $9.2 million should have been recorded as consideration for Sequential's purchase of part of the Activation Services business in according with Accounting Standards Codification, the source of GAAP.

237.    On March 3, 2017, Daniel Wu, a Research Analyst with Montgomery Global Investment Management wrote an article titled, "A (Related) Party at Synchronoss" stating that that the purchase price "represents only 2.5x [enterprise value]/EBITDA multiple. Whoever acquired the Activation business got an absolute bargain at the expense of Synchronoss shareholders."

238.    On April 6, 2017, the Company filed the 2017 Proxy Statement with the SEC. The 2017 Proxy Statement failed to disclose that: (1) a $9.2 million license agreement between the Company and Sequential was entered into for the lone purpose of artificially inflating the Company's financials; (2) the Company acquired Intralinks and misrepresented its future growth metrics due to the issues facing the Company's cloud computing business since 2015; (3) the newly-acquired Intralinks was underperforming; (4) the Company's integration of other acquisitions was underperforming; (5) the Company was facing serious hurdles integrating, and capitalizing on, its newly acquired companies; (6) as such, the Company's guidance was overstated; (7) the Company improperly recognized revenue; (8) the Company manipulated the figures and metrics in its financial statements; (9) the Company's financial statements were not prepared in accordance with GAAP; (10)  the Company failed to maintain internal controls; and

(11) as a result of the foregoing, Defendants' statements about Synchronoss' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

239.   On April 27, 2017, the Company issued a press release announcing management changes.  The Company disclosed that Defendant Hovsepian, the Company's CEO since its acquisition of Intralinks, would be leaving the Company "to pursue other interests" and that Defendant Frederick, the Company's CFO, would also be leaving "to pursue other interests." Additionally, the Company admitted that it "expects total revenue for the first quarter of 2017 to be $13 million to $14 million less than the company's previously announced guidance. Operating margins are expected to be 8% to 10%, which are less than previously announced guidance." Defendant Waldis further stated that the Company was "disappointed with our Q1 performance in this first quarter following our acquisition of Intralinks." The press release moreover announced that Defendant Waldis would assume the role of Company CEO once again.

240.   After making these disclosures, the Company's stock price fell $11.33 per share, or 46%, to close at $13.29 per share on April 27, 2017, on unusually heavy trading volume.

241.   On May 10, 2017, Daniel Wu wrote the article "Synchronoss Technologies: A Case Study on Destroying Shareholder Value." This article commented on the "unusually low price" for the Activation business. Wu also wrote that he was troubled by the fact that Sequential (formerly Omniglobe) was the buyer. When his firm "tried to find out more about STI, we discovered that it was a shell company that may have had links with SNCR management, raising the prospect of a related party transaction that could explain such a favorable price for the buyer."

242.     Wu continued that when he saw Synchronoss' Form 10-K filed on February 27, 2017 with the SEC, which finally confirmed to the public that Sequential "was formerly named Omniglobe International[,]" his "suspicions were reinforced."

243.     On May 12, 2017, the Company filed with the SEC a notification of its inability to file its quarterly report for the quarter ended March 31, 2017 on Form 10-Q with the SEC.

244.     On May 15, 2017, the Company issued a press release stating that it needed extra time to file with the SEC its quarterly report for the quarter ended March 31, 2017 because, *inter alia*, Defendant Waldis and newly appointed CFO Irving needed time to complete reviews of the accounting of certain transactions conducted in prior financial periods, which they did, and that its independent auditor subsequently advised that additional reviews by Defendant Waldis and Mr. Irving were needed, which the Company is in the process of completing.

245.     The Company's stock price opened on May 12, 2017 at $15.92 per share, but, due to the additional bad news about the late filing of the quarterly report, closed at $14.49 per share on the next trading day, May 15, 2017.

246.     On May 22, 2017, the Company issued a press release that stated that on May 16, 2017 it received notice from the Listing Qualifications Department of the NASDAQ.  The notice stated that the Company was "not in compliance with Nasdaq Listing Rule 5250(c)(1) because the Company has not yet filed its Quarterly Report on Form 10-Q for the period ended March 31, 2017…"

247.     Due to this yet additional bad news, the Company's stock price fell further to close at $12.82 per share on May 22, 2017.

**The Truth Fully Emerges**

248.    On June 13, 2017, the Company filed a Form 8-K ("June 2017 8-K") with the SEC announcing that the Company had concluded it would restate two years' worth of financial statements and that it had material weaknesses in internal control over financial reporting, stating in relevant part:

> On June 8, 2017, the Audit Committee of the Board of Directors of Synchronoss Technologies, Inc. (the "Company"), after consultation with management and discussion with Ernst & Young LLP, the Company's independent registered public accounting firm, concluded that *the Company's previously issued financial statements for the fiscal years ended December 31, 2016 and 2015 and the respective quarterly periods (collectively, the "Relevant Periods") should be restated and should no longer be relied upon.*

> As previously reported by the Company, its new Chief Executive Officer, Stephen Waldis and new Chief Financial Officer, Lawrence Irving, together with its Audit Committee of the Company's Board of Directors and with the assistance of accounting and legal advisors, initiated a thorough review of accounting of certain transactions conducted in the Relevant Periods. As a result of this review, *certain errors have been identified in the Relevant Periods concerning revenue recognition in connection with certain licensing transactions. The Company has determined that revenues from each of the applicable transactions should be recognized ratably over the term of the license contract or netted as part of the consideration transferred in connection with purchase accounting. While the Company has not yet completed its accounting review, the Company estimates that the revenue impact will be no more than 10% for each of the fiscal years ended December 31, 2016 and December 31, 2015.* In connection with the impact of the above errors, the Company also concluded that certain related expenses recognized in the Relevant Periods will be reversed.

> *The Company has concluded to restate its financial statements for the Relevant Periods to correct the above identified accounting errors and certain other immaterial prior period errors.* The Company does not expect the corrections to have an impact on total cash flows for the Relevant Periods, to result in any customer refunds or to impact the Company's services to its customers.

> The Company and its advisors are working expeditiously to complete this review and the Company intends to file its Form 10-Q for the quarter ended March 31, 2017 and restated financial statements for the Relevant Periods as soon as practicable.

***The Company has identified a material weakness in internal control over financial reporting relating to its revenue recognition process at December 31, 2016.  It is possible the Company may identify additional material weaknesses.***

(emphasis added).

249.    The June 2016 8-K's expectation that "revenue impact will be no more than 10% for each of the fiscal years ended December 31, 2016 and December 31, 2015" would amount to revenue overstatements to the tune of more than $105 million.

250.    On this news of the June 2016 8-K, the price per share of Synchronoss stock fell $0.87, or 7.1%, from the previous day's closing price to close at $11.26 on June 14, 2017.

251.    On June 22, 2017, Synchronoss discussed the restatement, revealing in a presentation to investors "[t]he restatement primarily corrects certain license transactions which were originally recognized as a perpetual license to either netting the license as part of purchase accounting or spreading the license ratably over an extended period of years." This indicated that the restatement would encompass the $9.2 million license payment connected to the Sequential transaction. Further, as the largest publicly-disclosed license revenue, the $25 million Verizon license would also be subject to restatement. The cumulative effect of these misstatements resulted in the Company portraying its Cloud Services business as rapidly growing through 2016, when in truth its revenue had been stagnating since 2015.

252.    On October 12, 2017, Synchronoss said investors could not rely on its previously issued financial statements for the fiscal year ended December 31, 2014 as they would need to be restated.

253.    On November 14, 2017, Synchronoss issued the press release, "Synchronoss Completes Sale of Intralinks to Siris Capital Group" announcing that the Company sold Intralinks, a company it had purchased within the last year, to a private equity group.

254.    Shortly thereafter, on November 16, 2017, the Company announced the resignation of Waldis as CEO and the appointment of Glenn Lurie as CEO.

255.    On July 2, 2018, the Company filed a Form 10-K for the fiscal year ending December 31, 2017 (the "2017 10-K") with the SEC. The 2017 10-K was signed by Defendants Lurie, Aquilina, Baker, Berger, Cadogan, Hopkins, McCormick, Moore, and Waldis. The 2017 10-K included the restatement of the Company's financial statements for the years ended in 2016 and 2015.

256.    On July 2, 2018, Synchronoss filed several disclosures (including several Forms 10-Qs and 10-K and 10-K/A) with the SEC that included restated financial information for fiscal years 2014 through 2016 and a description of the circumstances that led to the restatement, and amended those disclosures on July 9, 2018 (in the form of including several 10-Qs and 10-K and 10-K/A) (collectively these SEC filings on July 2, 2018 and July 9, 2018 are referred to as, the "Restatement").

257.    On this news of the Restatement filed on July 2, 2018, the price per share of Synchronoss stock fell $0.35, or over 5.1%, over the next two trading days to close at $6.49 on July 5, 2018.

258.    On this news of the Restatement filed on July 9, 2018, the price per share of Synchronoss stock fell $0.51, or over 7.8%, over the next two trading days to close at $5.95 on July 11, 2018.

259.    The Restatement revealed that Synchronoss only $17.1 million of license revenue had been recognized for all of 2016. Also, the amount of revenue recognized for the $25 million Verizon contract in the third quarter of 2016 results was clearly adjusted substantially downward as part of the Restatement.

260.    The Restatement included three primary categories of adjustments of revenue including: (i) revenue recognition adjustments relating to Hosting Services; (ii) revenue recognition adjustments related to establishing persuasive evidence of an arrangement and (iii) adjustments related to accounting for acquisitions and divestitures.

261.    The Restatement also acknowledged the improper accounting with respect to customers that Synchronoss had "master service agreements" like AT&T, stating in part:

> The Company historically has had, and continues to have, contractual arrangements with certain customers whereby there is an established master services agreement that includes general terms and conditions. Such master services agreements contemplate the delivery by the customer of purchasing documentation for purposes of completing orders, indicating the nature, price and quantity of products and services ordered.  In certain cases, the Company historically formed a view that persuasive evidence of an arrangement existed relating to such orders based upon its receipt from a customer of written confirmation of the order and commitment to pay the agreed price, such as a quote approval sent by the customer in response to a quote issued by the Company, but prior to that customer's subsequent delivery to the Company an executed statement of work or, in some instances, a purchase order, pursuant to a master services agreement.

262.    The magnitude of the Restatement was large. Synchronoss' cumulative revenue for 2014 through 2016, as restated, was adjusted downward from $1,212,168,000 to $1,032,271,000, a cumulative reduction of nearly $180 million (or more than 14.8%). The Company's 2014 revenues were adjusted downward by $74 million (from $457 million to $383 million, or 16%). The Company's 2015 revenues were adjusted downward by $56 million (from

$579 million to $523 million, or 9.6%). The Company's 2015 2016 revenues were adjusted downward by $50 million (from $622 million to $572 million, or 8.1%).

263.    The restatement of Synchronoss' net income (loss) from operations was even more pronounced. For 2016, Synchronoss' net income from operations of $8 million was restated to a net loss of $3 million (in other words, a 140% decrease in income). For 2015, Synchronoss' previously reported net income from operations of $47 million decreased to just $2 million, a decrease of nearly 95%. For 2014, net income from operations of $39 million was restated to a loss of $40 million, an over 200% decrease.

264.    Thus, while Synchronoss reported net income from operations from 2014 through 2016 of $93.5 million, in reality it had a cumulative loss during that time of $40 million (a difference of $134 million, a 143% decrease in net income). These dramatically restated income metrics demonstrate that Synchronoss has been in dire financial straits for years, a crucial fact obscured by Defendants' massive accounting fraud.

265.    The Restatement was a catastrophic event for Synchronoss, whose shares were halted NASDAQ as a result of it. The three-year span of time covered by the Restatement, and the fact that the Restatement resulted largely from pervasive and repetitive violations of basic revenue recognition principles, in connection with transactions with the Company's largest and most important customers, strongly that the Individual Defendants were aware of the wrongdoing.  Individual Defendants, including Waldis and Rosenberger, had unlimited access to the relevant financial data, including revenue, expense, income, acquisition, licensing, and other data, as well as their accounting treatment.

266.    The statements referenced in ¶¶ 173-212, 216-225, and 228-238 above were materially false and misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and prospects, which were known to the Individual Defendants or recklessly disregarded by them. Specifically, Defendants failed to disclose that: (1) an existing vendor (Sequential) had purchased the Company's activation business, and this existing vendor had been owned by Defendant Waldis and other members of the Company's senior management; (2) Omniglobe owns Sequential, and 50% of Omniglobe is owned by family and friends of the Company; (3) Sequential's current owner and Chairman is a related party with several ties to Defendant Waldis and the Company; (4) there was a prior and existing relationship between Sequential and the Company; (5) a $9.2 million license agreement between the Company and Sequential was entered into for the lone purpose of artificially inflating the Company's financials; (6) the Company acquired Intralinks and misrepresented its future growth metrics due to the issues facing the Company's cloud computing business since 2015; (7) the newly-acquired Intralinks was underperforming; (8) the Company's integration of other acquisitions was underperforming; (9) the Company was facing serious hurdles integrating, and capitalizing on, its newly acquired companies; (10) as such, the Company's guidance was overstated; (11) the Company manipulated the figures and metrics in its financial statements; (12) the Company improperly recognized revenue; (13) the Company's financial statements were not prepared in accordance with GAAP; (14) the Company failed to maintain internal controls; and (15) as a result of the foregoing, Defendants' statements about Synchronoss' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

**Failure to File Required Period Reports**

267.    The Company received notice from the Listing Qualifications Department of the NASDAQ on May 16, 2017 that the Company was not in compliance with NASDAQ Listing Rule 5250(c)(1) because it had not yet filed its quarterly report on Form 10-Q for the period ended March 31, 2017.

268.    In response, on July 17, 2017, the Company submitted a plan to the NASDAQ detailing how the Company planned to regain compliance with NASDAQ listing requirements.

269.    On July 26, 2017, NASDAQ granted the Company an exception to file any delinquent periodic reports by November 13, 2017.

270.    On August 16, 2017, the Company received notice from the Listing Qualifications Department of the NASDAQ that the Company yet again was not in compliance with NASDAQ Listing Rule 5250(c)(1) because it had not yet filed its quarterly report on Form 10-Q for the period ended June 30, 2017.  As a result of the delinquency of this filing, NASDAQ requested an update on the Company's previously accepted plan to regain compliance with NASDAQ's listing requirements.

271.    On May 11, 2018, Synchronoss filed a Form 8-K with the SEC revealing that due to its inability to become current with its SEC filings by May 10, 2018, trading of the Company' common stock would be suspended effective May 14, 2018, and the Company's stock would be delisted from NASDAQ after applicable appeal periods have lapsed.

272.    On June 29, 2018, the Company filed its Form 10-K for fiscal year 2017, which included the restatement of the Company's financial statements for the years ended in 2016 and

2015. Among other things, the Annual Report disclosed the Company had sustained heavy losses and sought to correct the accounting of the licensing transactions discussed herein.

**Repurchases**

273.   The Individual Defendants breached their fiduciary duties by causing the Company to repurchase its own stock at prices that were artificially inflated due to the false and misleading statements. According to the 2016 10-K,  "As of December 31, 2016, we repurchased approximately 1.3 million shares of our common stock under this program for an aggregate repurchase price of $40.0 million."

274.   The share prices at which the repurchases were made were artificially inflated due to false and misleading statements made by the Individual Defendants.

275.   The Company claims that there were no repurchases in 2017.

276.   According to the 2016 10-K, the Individual Defendants caused the Company to repurchase at least 1,261,971 shares of its common stock at average per share prices ranging from $30.00 to $35.64. As the true value of the Company's common stock was $11.26, the price per share of the Company's common stock when the truth emerged, Synchronoss considerably overpaid over $25.8 million for repurchases of its own stock.

**Insider Sales**

277.   During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed on April 27, 2017, several Defendants, including Waldis, Moore, Cadogan, and Hopkins, made the following sales of Company stock. They did not purchase Synchronoss stock during this time. These insider's individual sales are discussed in the Parties section, *supra*.

278.   Insiders made millions by selling their shares. Including, engaging in additional sales of stock going back to January 2014 and encompassing the three-year period for when the Company was misstating revenues. These sales include:

(a)   Waldis sold more than $29.5 million worth of Synchronoss stock on 40 separate occasions between January 1, 2014 and December 31, 2016.

(b)   McCormick sold more than $33.9 million worth of Synchronoss stock on 18 separate occasions between January 1, 2014 and December 31, 2016.

(c)   Cadogan sold more than $2.1 million worth of Synchronoss stock on five separate occasions between January 1, 2014 and December 31, 2016.

(d)   Hopkins sold more than $2.9 million worth of Synchronoss stock on three separate occasions between January 1, 2014 and December 31, 2016.

(e)   Moore sold more than $1.8 million worth of Synchronoss stock on eight separate occasions between January 1, 2014 and December 31, 2016.

279.   Although the Forms 4 disclosing stock sales by Waldis and Rosenberger were each purportedly made pursuant to a Rule 10(b)(5)-1 plan, given the changes in Defendant Waldis's and Rosenberger's patterns of stock sales in Synchronoss, the Rule 10(b)(5)-1 plan applicable to Defendants Waldis's and Rosenberger's transactions in Synchronoss stock must have been amended once or more during the Class Period. For example, beginning in April 2016 through October 2016, Defendant Waldis sold 13,000 shares of Synchronoss stock each month. In March 2016, he sold 77,430 shares (including 31,430 shares that were acquired as a result of the exercise of stock options). In addition, according to the Form 4s filed by Synchronoss, after his regular monthly sales of shares through October 2016, Defendant Waldis did not sell any

Synchronoss shares until February 2017, when he unloaded 33,970 shares. Further, Rosenberger's trading suspiciously ramped up prior to her resignation, which further supports that and 10(b)(5)-1 plans were amended.

## DAMAGES TO SYNCHRONOSS

280.    As a direct and proximate result of the Individual Defendants' conduct, Synchronoss will lose and expend many millions of dollars.

281.    Such losses include the Company's overpayment by more than $25.8 million for repurchasing its own stock during 2016.

282.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company and several of the Individual Defendants, and amounts paid to outside lawyers, accountants, and investigators in connection thereto. Additional expenditures were needed to investigate Plaintiff's Demand (defined below).

283.    Such losses include those incurred by the Company for entering related party transactions alleged herein that were unfair to the Company and entered under unfavorable terms.

284.    Such costs include, but are not limited to, compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, and the costs to the Company to restate two entire years' worth of financial statements.

285.    As a direct and proximate result of the Individual Defendants' conduct, Synchronoss has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

286.    Plaintiff brings this action derivatively and for the benefit of Synchronoss to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Synchronoss, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act, as well as the aiding and abetting thereof.

287.    Synchronoss is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

288.    Plaintiff is, and has been since before the beginning of the Relevant Period, a Synchronoss shareholder. Plaintiff will adequately and fairly represent the interests of Synchronoss in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND ALLEGATIONS

289.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

290.    Plaintiff brings this action derivatively in the right and for the benefit of Synchronoss to redress injuries suffered, and to be suffered, by Synchronoss as a direct result of breaches of fiduciary duty, unjust enrichment, waste of corporate assets, abuse of control, and gross mismanagement, by the Individual Defendants. Synchronoss is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

291.    Plaintiff will adequately and fairly represent the interests of Synchronoss in enforcing and prosecuting its claims.

292.     Plaintiff was a Synchronoss stockholder at the time of the wrongdoing complaint of, has continuously been a stockholder since that time, and is a current Synchronoss stockholder.

293.     On August 3, 2018, Plaintiff, through her counsel, sent a demand on Synchronoss' Board to investigate the violations of law described herein and to pursue remedies through litigation against the Individual Defendants for breaching their fiduciary duties by allowing Synchronoss to issue improper statements set forth herein (the "Demand"). The Demand is attached hereto as Exhibit A.

294.     On September 13, 2018, Plaintiff received a letter on behalf of the Board, acknowledging receipt of the Demand. The acknowledgement succinctly stated that the Board was reviewing Plaintiff's demand and "will notify you of its interested course of action when decided." The Board's September 13, 2018 letter is attached hereto as Exhibit B.

295.     Upon receiving no updates from the Board, Plaintiff, through counsel, sent a letter to the Board's counsel on June 24, 2019 to provide the Board with another opportunity to address the Demand and commence a civil action against the individuals responsible for the wrongdoing described in the Demand. Plaintiff's June 24, 2019 letter is attached hereto as Exhibit C.

296.     On July 9, 2019, the Board, through its counsel, responded to the Demand, stating that after an investigation, the Board had concluded to refuse Plaintiff's Demand (the "Demand Refusal Letter"). The Demand Refusal Letter is attached hereto as Exhibit D.

297.     In response to the Demand Refusal Letter, Plaintiff responded to the Board's counsel on October 2, 2019 stating the Demand Refusal Letter was not detailed enough to

evaluate whether the Board's investigation of the Demand. Accordingly, Plaintiff requested information and documents from the Board to evaluate whether the investigation of the Demand and the refusal of the Demand were reasonable and sufficient. Plaintiff's October 2, 2019 letter is attached hereto as Exhibit E.

298.   On October 31, 2019, the Board's counsel responded that Plaintiff's request for documents concerning the Board's investigation is denied. The October 31, 2019 letter is attached hereto as Exhibit F.

299.   At the time the Board refused Plaintiff's Demand, the Board consisted of Defendants Waldis, Cadogan, Hopkins, Rinne, Gyani, Baker, Berger, Aquilina, and Lurie.

300.   The Board wrongfully refused Plaintiff's Demand.

301.   First, the process by which the Board investigated the demand was improper. The Demand Review Committee (the "Committee") was comprised of two members, Rinne and Cadogan. The Committee was to consider the Demand and make a recommendation to the Board on how to proceed. Defendant Cadogan is not disinterested nor independent and therefore is not capable of evaluating Plaintiff's Demand. Cadogan has been a member of the Board since 2005 and was one of the director in which Plaintiff asked in her Demand for the Board to take action against. Further, Defendant Cadogan is a defendant in another shareholder litigation in which a motion to dismiss was denied and thus he faces a substantial likelihood of liability for similar conduct. Accordingly, Cadogan, one of the two members of the Committee, was tainted and is clearly not disinterested to evaluate the Demand particularly since a Court allowed a claim of breach of fiduciary duty to proceed against him on related conduct.

302.     Second, Rinne has known Board members for years, including Lurie for 15 years. Specifically, prior to joining Synchronoss' Board, Rinne and Lurie served concurrently as executives at Cingular Wireless for roughly nine years, as the CTO of Cingular Wireless from approximately 2005 to 2007, and as the President of National Distribution, AT&T Mobility/Cingular from approximately 2005 to 2008, respectively. Following the merger of Cingular Wireless and AT&T, the pair then continued to work concurrently with one another for an additional six years prior to joining Synchronoss' Board. From approximately 2007 until 2014, Rinne served as the Senior Vice President at AT&T, while Lurie was then serving as President of Other Enterprises at AT&T from approximately 2008 to 2014, before assuming the role of President and CEO of AT&T's Mobility and Consumer Operations in 2014. Thus, Rinne's professional relationship with Lurie dating back roughly fifteen years casts significant doubt as to whether Rinne could impartially investigate the Demands which implicate Lurie for significant misconduct. In addition to Rinne and defendant Lurie, other Synchronoss Board members previously served at AT&T as high-level employees, including Aquilina and Gyani, who served as Co-President of AT&T Consumer Services and Member of the Chairman's Operating Group for twenty-two years, and President and CEO of AT&T Wireless Mobility Services for three years, respectively.

303.     Further, the Demand Refusal Letter is void of detail regarding the investigation and steps taken to evaluate the Demand, including, how the Board decided who would be heading the investigation (particularly since Cadogan had been a director since 2005 and was an individual in which the Demand asked the Board to take action against but was participating in the investigation), what documents were reviewed, who was interviewed, what the materials

were from prior investigations considered, failed to provide copies of findings of reports from the investigation into the Demand and prior investigations, as well as an explanation why there was a finding that the Board lacked knowledge in errors in the Company's financial results. Even after Plaintiff requested this additional information, the Board refused to comply or address these inquiries.

304.    It is unclear by the Demand Refusal Letter who was questioned in the determination of the refusal including if witnesses identified in the Securities Class Action Complaint were interviewed.

305.    Further, given a Court found that Defendants Waldis, Cadogan, and Hopkins "face a substantial risk of liability" from the very allegations at the center of the Demand, Defendants Waldis, Cadogan, and Hopkins are conflicted and interested in the outcome of the Demands. As such, Defendants Waldis, Cadogan, and Hopkins were unable to act impartially with respect to evaluating the demand, including deciding whether to adopt the Committee's findings and recommendations with respect to the Demands, and should have recused themselves from the Board's vote. Their failure to do so renders the refusal wrongful and made in bad faith

306.    Several of the directors who voted to adopt the Committee's recommendations and refused Plaintiff's Demands also made, certified, and/or approved the exact false and misleading statements challenged in Plaintiff's Demands, or were otherwise implicated in the wrongdoing detailed therein, including Waldis, Lurie, Cadogan, and Hopkins. For instance, Waldis, Cadogan, and Hopkins each signed the materially false and misleading 2016 10-K, and Waldis is also alleged to have made numerous false and misleading statements on conference

calls with investors. Further, several Individual Defendants, including Waldis, Hopkins, and Cadogan, sold millions of dollars of Company stock with material, non-public information.

307.     The Demand Refusal Letter makes no mention of a written report in connection with the Board's purported investigation of the Demand or the Board's decision to refuse the Demand. In failing to produce a report, the Company neglected to keep a proper record of its investigation to allow Plaintiff and the Court to assess the reasonableness of its methodology in investigating the Demand. That the Company failed to issue any report is an incurable mistake to the refusal of the Demand because there is no adequate record of the investigation and recommendation of the Board and no evidentiary record upon which to determine whether the Board in good faith refused the Demand.

308.     Accordingly, the investigation was not reasonable nor was the Board's decision informed and made in good faith when it improperly refused the Demand. The Board's refusal of the Demand falls outside the protections of the business judgment rule and the action should be allowed to proceed.

## FIRST CLAIM

### Against the Individual Defendants for Violations of
### Section 14(a) of the Securities Exchange Act of 1934

309.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

310.     Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public

interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

311. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

312. Under the direction and watch of the Directors, the 2016 Proxy Statement failed to disclose that: (1) an existing vendor (Sequential) had purchased the Company's activation business, and this existing vendor had been owned by Defendant Waldis and other members of the Company's senior management; (2) Omniglobe owns Sequential, and 50% of Omniglobe is owned by family and friends of the Company; (3) Sequential's current owner and Chairman is a related party with several ties to Defendant Waldis and the Company; (4) there was a prior and existing relationship between Sequential and the Company; (5) a $9.2 million license agreement between the Company and Sequential was entered into for the lone purpose of artificially inflating the Company's financials; (6) the Company acquired Intralinks and misrepresented its future growth metrics due to the issues facing the Company's cloud computing business since 2015; (7) the newly-acquired Intralinks was underperforming; (8) the Company's integration of other acquisitions was underperforming; (9) the Company was facing serious hurdles integrating, and capitalizing on, its newly acquired companies; (10) as such, the Company's guidance was overstated; (11) the Company improperly recognized revenue; (12) the Company manipulated

the figures and metrics in its financial statements; (13) the Company's financial statements were not prepared in accordance with GAAP; (14) the Company failed to maintain internal controls; and (15) as a result of the foregoing, Defendants' statements about Synchronoss' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

313. Moreover, under the direction and watch of the Directors, the 2017 Proxy Statement failed to disclose that: (1) a $9.2 million license agreement between the Company and Sequential was entered into for the lone purpose of artificially inflating the Company's financials; (2) the Company acquired Intralinks and misrepresented its future growth metrics due to the issues facing the Company's cloud computing business since 2015; (3) the newly-acquired Intralinks was underperforming; (4) the Company's integration of other acquisitions was underperforming; (5) the Company was facing serious hurdles integrating, and capitalizing on, its newly acquired companies; (6) as such, the Company's guidance was overstated; (7) the Company improperly recognized revenue; (8) the Company manipulated the figures and metrics in its financial statements; (9) the Company's financial statements were not prepared in accordance with GAAP; (10) the Company failed to maintain internal controls; and (11) as a result of the foregoing, Defendants' statements about Synchronoss' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

314. In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2016 and 2017 Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2016 and 2017 Proxy Statements, including but not limited to,

election of directors, approval of officer compensation, and appointment of an independent auditor.

315.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2016 and 2017 Proxy Statements.

316.    Plaintiff on behalf of Synchronoss has no adequate remedy at law.

### SECOND CLAIM

**Against Individual Defendants for Violations of**
**Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934**

317.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

318.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Synchronoss. Not only is Synchronoss now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Synchronoss by the Individual Defendants.  With the price of its common stock trading at artificially-inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase over $11.4 million of its own shares on the open market at artificially-inflated prices, damaging Synchronoss by millions of dollars.

319.    During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

320.    The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Synchronoss not misleading.

321.    The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein.  Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Synchronoss.

322.    The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them.  The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through press releases, conference calls, and filings with the SEC.

323.    In addition to each of the Individual Defendants approving the issuance of the Company's false and misleading statements while they were serving as a senior executive or director of the Company, as members of the Board, each of the Individual Defendants then serving as a director would have signed the Company's false and misleading Form 10-K filed

with the SEC during the Relevant Period, including Defendants Waldis, Rosenberger, Hovsepian, Cadogan, Hopkins, McCormick, and Moore, who signed the 2016 10-K.

324.   By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

325.   Plaintiff on behalf of Synchronoss has no adequate remedy at law.

## THIRD CLAIM

### Against the Individual Defendants for Violations of Section 20(a) of the Securities Exchange Act of 1934

326.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

327.   The Individual Defendants, by virtue of their positions with Synchronoss and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Synchronoss within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Synchronoss to engage in the illegal conduct and practices complained of herein.

328.   Plaintiff on behalf of Synchronoss has no adequate remedy at law.

## FOURTH CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

329.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

330.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Synchronoss' business and affairs.

331.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

332.    The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of Synchronoss.

333.    In breach of their fiduciary duties owed to Synchronoss, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements of material fact. Specifically, Defendants failed to disclose that: (1) an existing vendor (Sequential) had purchased the Company's activation business, and this existing vendor had been owned by Defendant Waldis and other members of the Company's senior management; (2) Omniglobe owns Sequential, and 50% of Omniglobe is owned by family and friends of the Company; (3) Sequential's current owner and Chairman is a related party with several ties to Defendant Waldis and the Company; (4) there was a prior and existing relationship between Sequential and the Company; (5) a $9.2 million license agreement between the Company and Sequential was entered into for the lone purpose of artificially inflating the Company's financials; (6) the Company acquired Intralinks and misrepresented its future growth metrics due to the issues facing the Company's cloud computing business since 2015; (7) the newly-acquired Intralinks was underperforming; (8) the Company's integration of other acquisitions was underperforming; (9) the Company was facing serious hurdles integrating, and capitalizing on, its newly acquired companies; (10) as such, the Company's guidance was overstated; (11) the Company improperly recognized revenue; (12) the Company manipulated

the figures and metrics in its financial statements; (13) the Company's financial statements were not prepared in accordance with GAAP; (14) the Company failed to maintain internal controls; and (15) as a result of the foregoing, Defendants' statements about Synchronoss' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

334.     The Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.  A vast majority of the Individual Defendants engaged in lucrative insider sales while the price of the Company common stock was artificially inflated due to the false and misleading statements of material fact and while they caused the Company to engage in repurchasing its own stock.

335.     The Individual Defendants also breached their fiduciary duties by failing to maintain internal controls.

336.     The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Synchronoss' securities and disguising insider sales.

337.     The Individual Defendants had actual or constructive knowledge that that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to

fail to maintain adequate internal controls.  The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them.  Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Synchronoss' securities and engaging in insider sales.

338.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

339.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Synchronoss has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

340.    Plaintiff on behalf of Synchronoss has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Unjust Enrichment

341.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

342.    By their wrongful acts and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Synchronoss.

343.    The Individual Defendants either benefitted financially from the improper conduct and their making lucrative insider sales and received unjustly lucrative bonuses tied to

the false and misleading statements, or received bonuses, stock options, or similar compensation from Synchronoss that was tied to the performance or artificially inflated valuation of Synchronoss, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

344.    Plaintiff, as a shareholder and a representative of Synchronoss, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits -- including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

345.    Plaintiff on behalf of Synchronoss has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Abuse of Control

346.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

347.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Synchronoss, for which they are legally responsible.

348.    As a direct and proximate result of the Individual Defendants' abuse of control, Synchronoss has sustained significant damages.  As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Synchronoss has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

349.    Plaintiff on behalf of Synchronoss has no adequate remedy at law.

## SEVENTH CLAIM

### Against Individual Defendants for Gross Mismanagement

350.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

351.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Synchronoss in a manner consistent with the operations of a publicly-held corporation.

352.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Synchronoss has sustained and will continue to sustain significant damages.

353.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

354.    Plaintiff, on behalf of Synchronoss, has no adequate remedy at law.

## EIGHTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

355.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

356.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused Synchronoss to waste valuable corporate assets and to incur many millions of dollars of legal liability and/or costs to defend unlawful actions.  In addition, the Individual Defendants caused the Company to repurchase

- 104 -

shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

357.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

358.    Plaintiff on behalf of Synchronoss has no adequate remedy at law.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Synchronoss, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Synchronoss;

(c)    Determining and awarding to Synchronoss the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Synchronoss and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Synchronoss and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop

and implement procedures for greater shareholder input into the policies and guidelines of the board;

2.  a provision to permit the shareholders of Synchronoss to nominate at least three candidates for election to the board; and

3.  a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding Synchronoss restitution from Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff hereby demands a trial by jury.

Dated: June 12, 2020                     Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

<u>/s/Laurence M. Rosen</u>
Laurence M. Rosen, Esq.
One Gateway Center, Suite 2600
Newark, NJ 07102
Telephone: (973) 313-1887
Facsimile: (973) 833-0399
Email: lrosen@rosenlegal.com

**THE BROWN LAW FIRM, P.C.**
Timothy W. Brown, Esq.
240 Townsend Square
Oyster Bay, NY 11771

Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

DocuSign Envelope ID: E3C1A590-B757-48E2-B1CA-0CC6AE69E8A9

## **VERIFICATION**

I, Patricia Thieffry, am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 12th day of June, 2020.

DocuSigned by:

*Patricia Thieffry*

Patricia Thieffry

# EXHIBIT A

**The Rosen Law Firm**

I N V E S T O R   C O U N S E L

August 3, 2018

Phillip Kim
pkim@rosenlegal.com

**VIA FEDEX**

The Board of Directors
Synchronoss Technologies Inc.
200 Crossing Boulevard, 8th Floor
Bridgewater, New Jersey 08807

Re:   **Shareholder Demand on Synchronoss Technologies, Inc.'s Board of Directors**

Dear Directors of the Board:

We represent Patricia Thieffry (the "Shareholder"), who owns 100 shares of common stock of Synchronoss Technologies, Inc. ("Synchronoss" or the "Company") and has continuously owned them since September 2014.

We hereby demand that the Company's Board of Directors (the "Board") take action against certain current and/or former officers and directors of the Company, including, at least, Stephen G. Waldis ("Waldis"), William J. Cadogan ("Cadogan"), Thomas J. Hopkins ("Hopkins"), James M. McCormick ("McCormick"), Donnie M. Moore ("Moore"), Karen L. Rosenberger ("Rosenberger"), Ronald W. Hovsepian ("Hovsepian"), and John Frederick ("Frederick") (collectively, the "Officers and Directors") and any other individuals or entities that engaged in the wrongdoing as set forth below.

By reason of their positions as officers and/or directors of Synchronoss, and because of their ability to control its business and corporate affairs, the Officers and Directors owed Synchronoss and its shareholders fiduciary obligations of good faith, loyalty, and due care. They were and are required to use their utmost ability to control and manage the Company in a fair, just, and honest manner. Moreover, they were and are required to act in compliance with all applicable federal, state and local laws, rules, and regulations. Similarly, they were and are required to remain informed as to how Synchronoss conducts its business and corporate affairs, and upon notice or information of imprudent, illegal, or unsound conditions, policies, or practices, make reasonable inquiries in connection therewith, and take steps necessary to correct such conditions, policies, or practices, and further make such public disclosures as necessary to comply with all applicable laws.

As explained below, the Shareholder believes that the Officers and Directors violated these fiduciary principles and/or aided and abetted such breaches of fiduciary duties and were unjustly enriched to the detriment of the Company. Accordingly, Synchronoss must bring an action against those Officers and Directors seeking damages and restitution. In addition, the Company must adopt corporate governance improvements immediately.

Shareholder Demand on Synchronoss Technologies, Inc.'s Board of Directors
August 3, 2018
Page 2 of 9

## I. FACTUAL BACKGROUND

From October 28, 2015 through June 13, 2017 (the "Relevant Period"), the Officers and Directors willfully or with reckless disregard caused the Company to, among other things, (a) manipulate and falsely report its financial status through various maneuvers, including by improperly booking licensing income to grossly inflate revenue, (b) engage in sweetheart transactions with companies tied to "friends and family" of Company insiders to the detriment of the Company itself, (c) cause the Company to buy-back knowingly inflated stock to its detriment, and (d) engage in lucrative insider trades of the inflated shares. As detailed below, these acts and omissions breached the Officers' and Directors' duties and violated the law.

Synchronoss, founded by former AT&T executive Waldis in 2000, is a provider of mobile solutions for Service Providers and Enterprise through scalable software solutions and platforms. Synchronoss claims that it simplifies the creation and management of customer and employee experiences associated with identity, cloud, messaging, applied analytics, and secure mobility. At all relevant times, Synchronoss's two primary business lines were activation services for mobile devices ("Activation Services") and cloud services ("Cloud Services"). The Company announces revenues for each of those services separately.

Activation Services was the focus on the Company's business from its inception through 2013. AT&T was the Company's largest source of revenue for that service during the 2007-2012 period, when AT&T had exclusive rights to distribute iPhones. Starting in 2013, however, the Company began to pivot away from its Activation Services business and re-brand itself as a consumer and enterprise "cloud" services provider. Thereafter, the Cloud Services segment appeared to grow rapidly in 2013 and 2014, and by 2015 its reported revenue surpassed that generated from the Company's Activation Services.

In 2014, Synchronoss altered the mix of metrics determining executive compensation such that the Cloud Services business would account for a substantial component of executive compensation. Thus, Company management became highly incentivized to ensure that the Company broadcast high revenue growth in Cloud Services.

Following the change in executive compensation, the Company announced record-breaking growth in Cloud Services in the quarter ended September 30, 2014, reported revenue for Cloud Services that appeared to surpass that for Activation Services in 2015, and subsequently made it apparent that Cloud Services would continue to grow through 2016. Cloud Services increased from 46% of the Company's reported revenues in 2014 to 67% of its reported revenues in 2016.

In late 2015, Synchronoss booked revenues of $7 million in connection with two AT&T purchase transactions for which there is no evidence. In the first quarter of 2016, the Company recognized $5 million in licensing revenue from an agreement with Verizon that had not yet been signed, permitting the Company to show continued revenue growth in Cloud Services. On September 2, 2016, the SEC sent the Company a comment letter, asking, *inter alia*, that

Shareholder Demand on Synchronoss Technologies, Inc.'s Board of Directors
August 3, 2018
Page 3 of 9

Synchronoss "provide a narrative summary of the significant terms of any material agreements with either" AT&T or Verizon. Synchronoss refused to provide the SEC information on such contracts, despite repeated requests.

Similarly, during an earnings call held on November 7, 2016, Waldis announced that a $25 million license deal related to Cloud Services had been signed with Verizon. The Company then prematurely recognized the $25 million received as lump-sum revenue as opposed to ratably as required by U.S. Generally Accepted Accounting Principles ("GAAP"), thus inflating its Cloud Services financials.

While Cloud Services growth appeared to continue to expand based on Company reporting, Activation Services were reported as generating declining or flat growth throughout 2016. Against these reported financials, in late 2016, the Officers and Directors caused Synchronoss to engage in two simultaneous transactions that fundamentally transformed the Company.

First, the Company formed an agreement to sell 70% of the Activation Services segment to Sequential, which turned out to be a recently-formed shell company owned by Omniglobe USA ("Omniglobe"), for $146 million (the "Sequential transaction"). But these transactions were not at arms-length. In truth, as would be later revealed by investigative journalists, Omniglobe had been owned in part by Waldis, and was still owned primarily by "friends and family" of Synchronoss executives (including Waldis) at the time of the Sequential transaction. Synchronoss provided Sequential a $83 million seller's note to fund the transaction, while Sequential paid just $18.1 million in cash to consummate the transaction.

Also as part of the Sequential transaction, Sequential and the Company entered into an agreement providing Sequential with a perpetual license for certain analytics software products owned by the Company, valued by Synchronoss at $9.2 million. This $9.2 million figure lacked any objective basis: as evidenced by the Company's decision to use only Level 3 inputs, which are subjective, there is no existing fair value of the software. Synchronoss booked this $9.2 million all at once as licensing revenue in the quarter ended December 31, 2016, inflating Company revenues. This one-time revenue booking was not disclosed by Synchronoss until the Company filed its 2016 Form 10-K February 27, 2017 (after release of a February 24, 2017 investigative report, detailed below), despite making multiple public disclosures regarding the Sequential transaction prior to that date, including during conference calls where analysts asked questions regarding revenues from the Sequential transaction. By not revealing to investors that the $9.2 million represented one-time revenue rather than organic growth, the Company misled investors into believing that Cloud Services growth was greater than it actually was. Indeed, the $9.2 million should have been recorded as consideration for Sequential's purchase of part of the Activation Services business, in accordance with Accounting Standards Codification, the source of GAAP.

Second, simultaneous to its divestiture of its Activation Services business through the Sequential transaction, the Company also announced it was doubling down on its Cloud Services business through the acquisition of IntraLinks Holdings, Inc. ("Intralinks"), a cloud services

Shareholder Demand on Synchronoss Technologies, Inc.'s Board of Directors
August 3, 2018
Page 4 of 9

provider, for $821 million in cash – almost twice its then share price.  That acquisition was funded by proceeds from the Sequential transaction and $900 million in new debt.  In connection with the IntraLinks transaction, the Company announced that Waldis would soon step down from his position as CEO, to be replaced by Hovsepian, who was the head of IntraLinks.

Then, on February 14, 2017, the Company announced that Rosenberger would resign effective April 1, 2017. On March 2, 2017 the Company disclosed that Rosenberger was awarded a severance package that included a payment of $1,203,681, a transition payment of $200,000, and a three-month consulting arrangement for which she would be paid $580,000.

On February 24, 2017, the Southern Investigative Reporting Foundation published a report accusing Synchronoss of concealing key aspects of the Intralinks and Sequential deals from investors.  Among other things, the report revealed that Sequential was just a shell company formed in November 2016 that was actually owned by an entity called Omniglobe, a business process outsourcer that has extensive ties to the Company and its senior executives.  In fact, Omniglobe was 50% owned by "friends and family of Synchronoss."

On February 27, 2017, Synchronoss filed a Form 10-K with the SEC that revealed that a $9.2 million licensing agreement was entered into between the Company and Sequential for the use of Synchronoss's Analytics software, with the $9.2 million amount having been recorded as revenue and conveniently allowing the Company to meet its revenue and earnings targets. On the same date, the Company issued a press release announcing that Fredricks, IntraLink's Chief Financial Officer ("CFO") had been appointed as CFO of Synchronoss.

After making this disclosure, the Company's stock price fell $1.80 per share, or 5.9%, to close at $28.69 per share on February 27, 2017.

On April 27, 2017, the Company issued a press release announcing that its Chief Executive Officer ("CEO"), Hovsepian, and its CFO, Fredrick, would be leaving the Company "to pursue other interests."  Hovsepian and Fredrick received severance payments of $3.2 million and $1.2 million, respectively, and Hovsepian was awarded a two year-consulting agreement under which he would be paid $1.5 million. Additionally, the press release admitted that the Company "expect[ed] total revenue for the first quarter of 2017 to be $13 million to $14 million less than the company's previously announced guidance.  Operating margins are expected to be 8% to 10%, which are less than previously announced guidance."  Waldis, who would take over again as CEO, further stated that the Company was "disappointed with our Q1 performance in this first quarter following our acquisition of Intralinks."

After making this disclosure, the Company's stock price fell $11.33 per share, or 46%, to close at $13.29 per share on April 27, 2017.

On May 12, 2017, the Company filed with the SEC a notification of its inability to file with the agency its quarterly report for the quarter ended March 31, 2017 on Form 10-Q.

On May 15, 2017, the Company issued a press release stating that the Company needed extra time to file with the SEC its quarterly report for the quarter ended March 31, 2017 because,

Shareholder Demand on Synchronoss Technologies, Inc.'s Board of Directors
August 3, 2018
Page 5 of 9

*inter alia*, Waldis and newly appointed CFO Lawrence Irving needed time to complete reviews of the accounting of certain transactions conducted in prior financial periods, and that its independent auditor subsequently advised that additional reviews by Waldis and Mr. Irving were needed.

The Company's stock price opened on May 12, 2017 at $15.92 per share, but, due to the additional bad news about the late filing of the quarterly report, closed at $14.49 per share on the next trading day, May 15, 2017.

On May 22, 2017, the Company issued a press release that stated that on May 16, 2017, it received notice from the Listing Qualifications Department of the NASDAQ. The notice stated that the Company was "not in compliance with Nasdaq Listing Rule 5250(c)(1) because the Company has not yet filed its Quarterly Report on Form 10-Q for the period ended March 31, 2017 . . ."

On this news, the Company's stock price fell further to close at $12.82 per share on May 22, 2017.

On June 13, 2017, the Company filed a Form 8-K with the SEC announcing that the Company's previously filed financial statements for the fiscal years ended December 31, 2016 and 2015 and the quarterly periods within those years would need to be restated and could no longer be relied upon. Synchronoss stated that errors had been identified in those statements "concerning revenue recognition in connection with certain licensing transactions," and it had "determined that revenues from each of the applicable transactions should be recognized ratably over the term of the license contract or netted as part of the consideration transferred in connection with purchase accounting." The Form 8-K reported that "the Company estimates that the revenue impact will be no more than 10% for each of the fiscal years ended December 31, 2016 and December 31, 2015," amounting to revenue overstatements to the tune of more than *$105 million*. Synchronoss additionally admitted, "[t]he Company has identified a material weakness in internal control over financial reporting relating to its revenue recognition process at December 31, 2016. It is possible the Company may identify additional material weaknesses."

On this news, the Company's stock price fell further to close at $11.26 per share on June 14, 2017, a drop of 7.1%, or $0.87.

In a presentation to investors made on June 22, 2017, Synchronoss revealed that "[t]he restatement primarily corrects certain license transactions which were originally recognized as a perpetual license to either netting the license as part of purchase accounting or spreading the license ratably over an extended period of years," indicating that the restatement would encompass the $9.2 million license payment connected to the Sequential transaction. Further, as the largest publicly-disclosed license revenue, the $25 million Verizon license would also be subject to restatement. The cumulative effect of these misstatements resulted in the Company portraying its Cloud Services business as rapidly growing through 2016, when in truth its revenue had been stagnating since 2015.

Shareholder Demand on Synchronoss Technologies, Inc.'s Board of Directors
August 3, 2018
Page 6 of 9

On November 16, 2017, Synchronoss announced that the Company had sold IntraLinks to a private equity firm, only nine months after purchasing the company. In addition, the Company announced that Waldis would be stepping down as CEO.

On May 11, 2018, the Company filed a Form 8-K with the SEC revealing that, due to its inability to become current with its filings with the SEC by May 10, 2018, trading of Synchronoss's common stock would be suspended effective May 14, 2018, and the Company's stock would be delisted from the NASDAQ after applicable appeal periods have lapsed. On June 29, 2018, the Company filed its Form 10-K for fiscal year 2017, which included the restatement of the Company's financial statements for the years ended in 2016 and 2015. Among other things, the Annual Report disclosed the Company had sustained heavy losses and sought to correct the accounting of the licensing transactions discussed herein.

The Officers' and Directors' actions and statements outlined above were improper and illegal. The Officers and Directors intentionally and/or recklessly disseminated and/or caused the Company to disseminate materially false and misleading statements regarding the Company's business, operations, and prospects designed to artificially inflate the Company's sagging revenues, including a failure to disclose that: (1) an existing vendor (Sequential) had purchased the Company's activation business, and Sequential (through Omniglobe) had been owned by Waldis and other members of the Company's senior management; (2) Omniglobe owns Sequential, and 50% of Omniglobe is owned by family and friends of the Company; (3) Sequential's owner and Chairman at the time the Company purchased Sequential was a related party with several ties to Waldis and the Company; (4) there was a prior and existing relationship between Sequential and the Company; (5) a $9.2 million license agreement between the Company and Sequential was entered into for the lone purpose of artificially inflating the Company's financials; (6) the Company acquired Intralinks and misrepresented its future growth metrics to mask the Company's stagnation in the cloud computing business since 2015; (7) the newly-acquired Intralinks was underperforming and the Company was facing serious hurdles integrating, and capitalizing on, its newly acquired company; (8) senior management participated in artificially inflating revenues in order to meet projections and market expectations in violation of GAAP; (9) the Company prematurely recognized licensing revenues in the period the agreements were formed, instead of recognizing revenues ratably over the life of the agreements, in violation of GAAP; (10) as a result of the foregoing, the Company's guidance was overstated; and (11) the Company failed to maintain internal controls.

Such false and misleading statements and omissions allowed the Company to mislead investors as to the extent of the actual risk involved in investing in the Company. The Company in fact was a materially less-safe investment than Synchronoss led investors to believe.

By virtue of their leadership roles and the fact that these transactions concerned the core operations of the Company, the Officers and Directors at all relevant times knew or recklessly disregarded that the true state of Synchronoss's business, operations, and prospects was materially different from what the Company portrayed to the investing public. Indeed, the Officers and Directors signed-off on those very statements, in misleading securities filings, press releases, and proxy statements. These included the 2016 10-K (signed by all Officers and

Shareholder Demand on Synchronoss Technologies, Inc.'s Board of Directors
August 3, 2018
Page 7 of 9

Directors but Frederick), and 10-Qs (signed off by Waldis and Rosenberger), the 2016 Proxy Statement (approved by the entire Board), and various press releases and earnings calls during that time (involving Waldis and Rosenberger). In addition, the Officers and Directors failed to timely correct and/or caused the Company to fail to correct these false and/or misleading statements and/or omissions of material fact, further rendering them personally liable to the Company for breaching their fiduciary duties.

Even had they not participated in the misleading statements, Synchronoss's pervasive wrongdoing in the above-described schemes could not have escaped the notice of the Officers and Directors had they been appropriately discharging their fiduciary duties to the Company. In other words, even if the Officers and Directors had not intentionally and/or recklessly engaged in such wrongful acts, they consciously chose not to implement and maintain policies and procedures adequate and necessary to ensure such wrongful acts did not occur (i.e., adequate internal controls), in further breach of their fiduciary duties.

Separately, and independently, six of the Officers and Directors listed above engaged in lucrative insider sales and improperly benefitted themselves while the Company's stock was artificially inflated due to the false and misleading statements. While the price of the Company's stock was artificially inflated, Waldis sold 223,639 Company shares on inside information, from which he received nearly $7.7 million in proceeds. Rosenberger sold 32,172 Company shares on inside information, from which she received nearly $1.2 million in proceeds, and the majority of these sales occurred just prior to her resignation. Cadogan sold 30,000 Company shares on inside information, from which he received nearly $1.3 million in proceeds. Hopkins sold 27,500 Company shares on inside information, from which he received over $1.1 million in proceeds. McCormick sold 27,500 Company shares on inside information, from which he received $1.1 million in proceeds. Moore sold 22,000 Company shares on inside information, from which he received approximately $916,575 in proceeds. Thus, in total, six of the Officers and Directors sold 362,811 Company shares on inside information when the price of the shares was artificially inflated, from which they received over $13.3 million in proceeds.

Finally, and also independently, the Officers and Directors breached their fiduciary duties by causing the Company to repurchase its own stock at prices that were artificially inflated due to the false and misleading statements discussed herein. During the period these statements were made, the Officers and Directors caused the Company to repurchase at least 1,261,971 shares of its common stock at average per share prices ranging from $30.00 to $35.64. As the true value of the Company's common stock was $11.26, the price per share of the Company's common stock when the truth emerged, Synchronoss overpaid over $25.8 million for repurchases of its own stock.

The Company has been substantially damaged as a result of the Officers and Directors' breaches of fiduciary duty and other misconduct. These developments have plunged the Company into a period of chaos and uncertainty. Specifically, the aforementioned misconduct has subjected Synchronoss, Waldis, and Rosenberger to being named as defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the District of

Shareholder Demand on Synchronoss Technologies, Inc.'s Board of Directors
August 3, 2018
Page 8 of 9

New Jersey, captioned *In Re Synchronoss Technologies, Inc. Securities Litigation*, No. 3:17-cv-2978 (the "Securities Class Action").

As a direct and proximate result of the misconduct described herein, Synchronoss has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company and certain of Synchronoss's officers and directors for violations of federal and state laws, and amounts paid to outside lawyers, accountants, and investigators in connection with any internal investigations. Such expenditures also include losses incurred as a result of entering into related party transactions that were unfair to the Company, loss of valuable cash assets through the Company's inflated stock buy-backs, and costs associated with restating two years of financial statements. As a further direct and proximate result of the misconduct described herein, Synchronoss has suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future.

## II. DEMAND

Our client demands that the Board commence a civil action against each responsible individual to recover the above-referenced losses for the benefit of the Company, including, at least, by naming the Officers and Directors, and any other individuals or entities that engaged in the wrongdoing as set forth herein as defendants for their breaches of fiduciary duties, gross mismanagement, abuse of control, waste of assets, unjust enrichment, and violations of Sections 14(a), 10(b), and 20(a) of the Securities Exchange Act of 1934, as well as for the aiding and abetting of these breaches and violations. The Board must also assess whether any third parties should be sued, such as Synchronoss's financial advisors, auditors, or attorneys. Synchronoss must also adopt corporate governance improvements immediately that are designed to detect and deter future wrongdoing.

Please confirm receipt of this letter and the measures that you plan to take to address the harm inflicted upon Synchronoss as a result of the conduct described herein. If you have any questions, please do not hesitate to contact the undersigned counsel.

If, after the receipt of this letter, the Board has not commenced action as demanded within a reasonable period of time, we intend to initiate litigation on behalf of the Company. We are willing to assist the Board as it conducts the investigation and will review and comment upon all reports and information generated in the course of its work.

Shareholder Demand on Synchronoss Technologies, Inc.'s Board of Directors
August 3, 2018
Page 9 of 9

Thank you for your attention to these matters.

Very truly yours,

Phillip Kim, Esq.

-And-

Timothy W. Brown
The Brown Law Firm, P.C.
240 Townsend Square
Oyster Bay, NY 11771

# EXHIBIT B



SILICON VALLEY
ANN ARBOR
BEIJING
BOSTON
LOS ANGELES
NEW YORK
SAN DIEGO
SAN FRANCISCO
SINGAPORE

September 13, 2018


Phillip Kim, Esq.
The Rosen Law Firm
275 Madison Avenue
New York, NY  10016

Dear Mr. Kim:

We are corporate counsel to Synchronoss Technologies, Inc., ("Company") and write in response to your August 3, 2018 correspondence (the "Demand").  We write to acknowledge receipt of your Demand by the Board of Directors (the "Board").  The Board is reviewing the Demand and will notify you of its intended course of action when decided.


Very truly yours,

Marc Dupre

GUNDERSON  DETTMER  STOUGH  VILLENEUVE  FRANKLIN  &  HACHIGIAN, LLP

ONE MARINA PARK DRIVE, SUITE 900, BOSTON, MA 02210 / PHONE: 617.648.9100 / FAX: 617.648.9199

# EXHIBIT C



## The Rosen Law Firm
### INVESTOR COUNSEL

June 24, 2019

Phillip Kim
pkim@rosenlegal.com

**VIA EMAIL AND FEDEX**

Marc Dupre, Esq.
Gunderson Dettmer
One Marina Park Drive
Suite 900
Boston, MA 02210

<b>Re:   Shareholder Demand on Synchronoss Technologies, Inc.'s Board of Directors</b>

Dear Mr. Dupre:

We represent Patricia Thieffry, who owns 100 shares of common stock of Synchronoss Technologies, Inc. ("Synchronoss" or the "Company") and has continuously owned them since September 2014.

On August 3, 2018, more than ten months ago, we made a demand on the Company's Board of Directors (the "Board"). (*See* Exhibit A, attached to this letter (the "Demand")). The Demand requested that the Board take action against certain current and/or former officers and directors of the Company who, from October 28, 2015 through June 13, 2017, willfully or with reckless disregard caused the Company to, among other things, (a) manipulate and falsely report its financial status through various maneuvers, including by improperly booking licensing income to grossly inflate revenue, (b) engage in sweetheart transactions with companies tied to "friends and family" of Company insiders to the detriment of the Company itself, (c) cause the Company to buy-back knowingly inflated stock to its detriment, and (d) engage in lucrative insider trades of the inflated shares.

On September 13, 2018, you responded with a one paragraph letter that stated, in its entirety:

> We are corporate counsel to Synchronoss Technologies, Inc., ("Company") and write in response to your August 3, 2018 correspondence (the "Demand"). We write to acknowledge receipt of your Demand by the Board of Directors (the "Board"). The Board is reviewing the Demand and will notify you of its intended course of action when decided.

We have not heard anything further from you for more than nine months.

Although the Board has clearly failed to respond to the Demand within a reasonable time, we write now to give it a final chance to address the Demand and commence a civil action

Shareholder Demand on Synchronoss Technologies, Inc.'s Board of Directors
June 24, 2019
Page 2 of 2

against the individuals responsible for the wrongdoing described in the Demand. Time is short, however, because, under Delaware law, there is a three-year statute of limitations for breach of fiduciary duty. *See Swift v. Pandley*, 2014 WL 1366436, at *7-*10 (D.N.J. April 7, 2014) (holding that the Delaware statute of limitations applies to claims arising out of the internal affairs of a Delaware corporation). Therefore, we will initiate an action on behalf of the Company prior to August 3, 2019, which is three years after the Company announced its second quarter 2016 financial results, unless the Board takes action prior to that date. Although, we believe that the statute of limitations for any of the wrongful acts alleged in the Demand did not start to run until at least after the date that the wrongdoing was revealed in 2017, the potential defendants in this matter may not agree with our position. Therefore, we feel compelled to file suit prior to August 3, 2019, to protect the rights of the Company. Furthermore, our request that the Board take action prior to that date is eminently reasonable because the Board will have had an entire year to consider the Demand.

As we stated in the Demand, we are happy to answer any questions and willing to assist the Board as it conducts the investigation. Thank you for your attention to these matters.

Very truly yours,

Phillip Kim, Esq.

-And-

Timothy Brown, Esq.
The Brown Law Firm, P.C.
240 Townsend Square
Oyster Bay, NY 11771

# EXHIBIT A

# The Rosen Law Firm

### INVESTOR COUNSEL

August 3, 2018

Phillip Kim
pkim@rosenlegal.com

**VIA FEDEX**

The Board of Directors
Synchronoss Technologies Inc.
200 Crossing Boulevard, 8th Floor
Bridgewater, New Jersey 08807

**Re:  Shareholder Demand on Synchronoss Technologies, Inc.'s Board of Directors**

Dear Directors of the Board:

We represent Patricia Thieffry (the "Shareholder"), who owns 100 shares of common stock of Synchronoss Technologies, Inc. ("Synchronoss" or the "Company") and has continuously owned them since September 2014.

We hereby demand that the Company's Board of Directors (the "Board") take action against certain current and/or former officers and directors of the Company, including, at least, Stephen G. Waldis ("Waldis"), William J. Cadogan ("Cadogan"), Thomas J. Hopkins ("Hopkins"), James M. McCormick ("McCormick"), Donnie M. Moore ("Moore"), Karen L. Rosenberger ("Rosenberger"), Ronald W. Hovsepian ("Hovsepian"), and John Frederick ("Frederick") (collectively, the "Officers and Directors") and any other individuals or entities that engaged in the wrongdoing as set forth below.

By reason of their positions as officers and/or directors of Synchronoss, and because of their ability to control its business and corporate affairs, the Officers and Directors owed Synchronoss and its shareholders fiduciary obligations of good faith, loyalty, and due care. They were and are required to use their utmost ability to control and manage the Company in a fair, just, and honest manner. Moreover, they were and are required to act in compliance with all applicable federal, state and local laws, rules, and regulations. Similarly, they were and are required to remain informed as to how Synchronoss conducts its business and corporate affairs, and upon notice or information of imprudent, illegal, or unsound conditions, policies, or practices, make reasonable inquiries in connection therewith, and take steps necessary to correct such conditions, policies, or practices, and further make such public disclosures as necessary to comply with all applicable laws.

As explained below, the Shareholder believes that the Officers and Directors violated these fiduciary principles and/or aided and abetted such breaches of fiduciary duties and were unjustly enriched to the detriment of the Company. Accordingly, Synchronoss must bring an action against those Officers and Directors seeking damages and restitution. In addition, the Company must adopt corporate governance improvements immediately.

Shareholder Demand on Synchronoss Technologies, Inc.'s Board of Directors
August 3, 2018
Page 2 of 9

## I. FACTUAL BACKGROUND

From October 28, 2015 through June 13, 2017 (the "Relevant Period"), the Officers and Directors willfully or with reckless disregard caused the Company to, among other things, (a) manipulate and falsely report its financial status through various maneuvers, including by improperly booking licensing income to grossly inflate revenue, (b) engage in sweetheart transactions with companies tied to "friends and family" of Company insiders to the detriment of the Company itself, (c) cause the Company to buy-back knowingly inflated stock to its detriment, and (d) engage in lucrative insider trades of the inflated shares. As detailed below, these acts and omissions breached the Officers' and Directors' duties and violated the law.

Synchronoss, founded by former AT&T executive Waldis in 2000, is a provider of mobile solutions for Service Providers and Enterprise through scalable software solutions and platforms. Synchronoss claims that it simplifies the creation and management of customer and employee experiences associated with identity, cloud, messaging, applied analytics, and secure mobility. At all relevant times, Synchronoss's two primary business lines were activation services for mobile devices ("Activation Services") and cloud services ("Cloud Services"). The Company announces revenues for each of those services separately.

Activation Services was the focus on the Company's business from its inception through 2013. AT&T was the Company's largest source of revenue for that service during the 2007-2012 period, when AT&T had exclusive rights to distribute iPhones. Starting in 2013, however, the Company began to pivot away from its Activation Services business and re-brand itself as a consumer and enterprise "cloud" services provider. Thereafter, the Cloud Services segment appeared to grow rapidly in 2013 and 2014, and by 2015 its reported revenue surpassed that generated from the Company's Activation Services.

In 2014, Synchronoss altered the mix of metrics determining executive compensation such that the Cloud Services business would account for a substantial component of executive compensation. Thus, Company management became highly incentivized to ensure that the Company broadcast high revenue growth in Cloud Services.

Following the change in executive compensation, the Company announced record-breaking growth in Cloud Services in the quarter ended September 30, 2014, reported revenue for Cloud Services that appeared to surpass that for Activation Services in 2015, and subsequently made it apparent that Cloud Services would continue to grow through 2016. Cloud Services increased from 46% of the Company's reported revenues in 2014 to 67% of its reported revenues in 2016.

In late 2015, Synchronoss booked revenues of $7 million in connection with two AT&T purchase transactions for which there is no evidence. In the first quarter of 2016, the Company recognized $5 million in licensing revenue from an agreement with Verizon that had not yet been signed, permitting the Company to show continued revenue growth in Cloud Services. On September 2, 2016, the SEC sent the Company a comment letter, asking, *inter alia*, that

Shareholder Demand on Synchronoss Technologies, Inc.'s Board of Directors
August 3, 2018
Page 3 of 9

Synchronoss "provide a narrative summary of the significant terms of any material agreements with either" AT&T or Verizon.  Synchronoss refused to provide the SEC information on such contracts, despite repeated requests.

Similarly, during an earnings call held on November 7, 2016, Waldis announced that a $25 million license deal related to Cloud Services had been signed with Verizon.  The Company then prematurely recognized the $25 million received as lump-sum revenue as opposed to ratably as required by U.S. Generally Accepted Accounting Principles ("GAAP"), thus inflating its Cloud Services financials.

While Cloud Services growth appeared to continue to expand based on Company reporting, Activation Services were reported as generating declining or flat growth throughout 2016.  Against these reported financials, in late 2016, the Officers and Directors caused Synchronoss to engage in two simultaneous transactions that fundamentally transformed the Company.

First, the Company formed an agreement to sell 70% of the Activation Services segment to Sequential, which turned out to be a recently-formed shell company owned by Omniglobe USA ("Omniglobe"), for $146 million (the "Sequential transaction").  But these transactions were not at arms-length.  In truth, as would be later revealed by investigative journalists, Omniglobe had been owned in part by Waldis, and was still owned primarily by "friends and family" of Synchronoss executives (including Waldis) at the time of the Sequential transaction. Synchronoss provided Sequential a $83 million seller's note to fund the transaction, while Sequential paid just $18.1 million in cash to consummate the transaction.

Also as part of the Sequential transaction, Sequential and the Company entered into an agreement providing Sequential with a perpetual license for certain analytics software products owned by the Company, valued by Synchronoss at $9.2 million.  This $9.2 million figure lacked any objective basis:  as evidenced by the Company's decision to use only Level 3 inputs, which are subjective, there is no existing fair value of the software.  Synchronoss booked this $9.2 million all at once as licensing revenue in the quarter ended December 31, 2016, inflating Company revenues.  This one-time revenue booking was not disclosed by Synchronoss until the Company filed its 2016 Form 10-K February 27, 2017 (after release of a February 24, 2017 investigative report, detailed below), despite making multiple public disclosures regarding the Sequential transaction prior to that date, including during conference calls where analysts asked questions regarding revenues from the Sequential transaction.  By not revealing to investors that the $9.2 million represented one-time revenue rather than organic growth, the Company misled investors into believing that Cloud Services growth was greater than it actually was.  Indeed, the $9.2 million should have been recorded as consideration for Sequential's purchase of part of the Activation Services business, in accordance with Accounting Standards Codification, the source of GAAP.

Second, simultaneous to its divestiture of its Activation Services business through the Sequential transaction, the Company also announced it was doubling down on its Cloud Services business through the acquisition of IntraLinks Holdings, Inc. ("Intralinks"), a cloud services

Shareholder Demand on Synchronoss Technologies, Inc.'s Board of Directors
August 3, 2018
Page 4 of 9

provider, for $821 million in cash – almost twice its then share price.  That acquisition was funded by proceeds from the Sequential transaction and $900 million in new debt.  In connection with the IntraLinks transaction, the Company announced that Waldis would soon step down from his position as CEO, to be replaced by Hovsepian, who was the head of IntraLinks.

Then, on February 14, 2017, the Company announced that Rosenberger would resign effective April 1, 2017. On March 2, 2017 the Company disclosed that Rosenberger was awarded a severance package that included a payment of $1,203,681, a transition payment of $200,000, and a three-month consulting arrangement for which she would be paid $580,000.

On February 24, 2017, the Southern Investigative Reporting Foundation published a report accusing Synchronoss of concealing key aspects of the Intralinks and Sequential deals from investors.  Among other things, the report revealed that Sequential was just a shell company formed in November 2016 that was actually owned by an entity called Omniglobe, a business process outsourcer that has extensive ties to the Company and its senior executives.  In fact, Omniglobe was 50% owned by "friends and family of Synchronoss."

On February 27, 2017, Synchronoss filed a Form 10-K with the SEC that revealed that a $9.2 million licensing agreement was entered into between the Company and Sequential for the use of Synchronoss's Analytics software, with the $9.2 million amount having been recorded as revenue and conveniently allowing the Company to meet its revenue and earnings targets. On the same date, the Company issued a press release announcing that Fredricks, IntraLink's Chief Financial Officer ("CFO") had been appointed as CFO of Synchronoss.

After making this disclosure, the Company's stock price fell $1.80 per share, or 5.9%, to close at $28.69 per share on February 27, 2017.

On April 27, 2017, the Company issued a press release announcing that its Chief Executive Officer ("CEO"), Hovsepian, and its CFO, Fredrick, would be leaving the Company "to pursue other interests."  Hovsepian and Fredrick received severance payments of $3.2 million and $1.2 million, respectively, and Hovsepian was awarded a two year-consulting agreement under which he would be paid $1.5 million. Additionally, the press release admitted that the Company "expect[ed] total revenue for the first quarter of 2017 to be $13 million to $14 million less than the company's previously announced guidance.  Operating margins are expected to be 8% to 10%, which are less than previously announced guidance."  Waldis, who would take over again as CEO, further stated that the Company was "disappointed with our Q1 performance in this first quarter following our acquisition of Intralinks."

After making this disclosure, the Company's stock price fell $11.33 per share, or 46%, to close at $13.29 per share on April 27, 2017.

On May 12, 2017, the Company filed with the SEC a notification of its inability to file with the agency its quarterly report for the quarter ended March 31, 2017 on Form 10-Q.

On May 15, 2017, the Company issued a press release stating that the Company needed extra time to file with the SEC its quarterly report for the quarter ended March 31, 2017 because,

Shareholder Demand on Synchronoss Technologies, Inc.'s Board of Directors
August 3, 2018
Page 5 of 9

*inter alia*, Waldis and newly appointed CFO Lawrence Irving needed time to complete reviews of the accounting of certain transactions conducted in prior financial periods, and that its independent auditor subsequently advised that additional reviews by Waldis and Mr. Irving were needed.

The Company's stock price opened on May 12, 2017 at $15.92 per share, but, due to the additional bad news about the late filing of the quarterly report, closed at $14.49 per share on the next trading day, May 15, 2017.

On May 22, 2017, the Company issued a press release that stated that on May 16, 2017, it received notice from the Listing Qualifications Department of the NASDAQ. The notice stated that the Company was "not in compliance with Nasdaq Listing Rule 5250(c)(1) because the Company has not yet filed its Quarterly Report on Form 10-Q for the period ended March 31, 2017 . . ."

On this news, the Company's stock price fell further to close at $12.82 per share on May 22, 2017.

On June 13, 2017, the Company filed a Form 8-K with the SEC announcing that the Company's previously filed financial statements for the fiscal years ended December 31, 2016 and 2015 and the quarterly periods within those years would need to be restated and could no longer be relied upon. Synchronoss stated that errors had been identified in those statements "concerning revenue recognition in connection with certain licensing transactions," and it had "determined that revenues from each of the applicable transactions should be recognized ratably over the term of the license contract or netted as part of the consideration transferred in connection with purchase accounting." The Form 8-K reported that "the Company estimates that the revenue impact will be no more than 10% for each of the fiscal years ended December 31, 2016 and December 31, 2015," amounting to revenue overstatements to the tune of more than *$105 million*. Synchronoss additionally admitted, "[t]he Company has identified a material weakness in internal control over financial reporting relating to its revenue recognition process at December 31, 2016. It is possible the Company may identify additional material weaknesses."

On this news, the Company's stock price fell further to close at $11.26 per share on June 14, 2017, a drop of 7.1%, or $0.87.

In a presentation to investors made on June 22, 2017, Synchronoss revealed that "[t]he restatement primarily corrects certain license transactions which were originally recognized as a perpetual license to either netting the license as part of purchase accounting or spreading the license ratably over an extended period of years," indicating that the restatement would encompass the $9.2 million license payment connected to the Sequential transaction. Further, as the largest publicly-disclosed license revenue, the $25 million Verizon license would also be subject to restatement. The cumulative effect of these misstatements resulted in the Company portraying its Cloud Services business as rapidly growing through 2016, when in truth its revenue had been stagnating since 2015.

Shareholder Demand on Synchronoss Technologies, Inc.'s Board of Directors
August 3, 2018
Page 6 of 9

On November 16, 2017, Synchronoss announced that the Company had sold IntraLinks to a private equity firm, only nine months after purchasing the company. In addition, the Company announced that Waldis would be stepping down as CEO.

On May 11, 2018, the Company filed a Form 8-K with the SEC revealing that, due to its inability to become current with its filings with the SEC by May 10, 2018, trading of Synchronoss's common stock would be suspended effective May 14, 2018, and the Company's stock would be delisted from the NASDAQ after applicable appeal periods have lapsed. On June 29, 2018, the Company filed its Form 10-K for fiscal year 2017, which included the restatement of the Company's financial statements for the years ended in 2016 and 2015. Among other things, the Annual Report disclosed the Company had sustained heavy losses and sought to correct the accounting of the licensing transactions discussed herein.

The Officers' and Directors' actions and statements outlined above were improper and illegal. The Officers and Directors intentionally and/or recklessly disseminated and/or caused the Company to disseminate materially false and misleading statements regarding the Company's business, operations, and prospects designed to artificially inflate the Company's sagging revenues, including a failure to disclose that: (1) an existing vendor (Sequential) had purchased the Company's activation business, and Sequential (through Omniglobe) had been owned by Waldis and other members of the Company's senior management; (2) Omniglobe owns Sequential, and 50% of Omniglobe is owned by family and friends of the Company; (3) Sequential's owner and Chairman at the time the Company purchased Sequential was a related party with several ties to Waldis and the Company; (4) there was a prior and existing relationship between Sequential and the Company; (5) a $9.2 million license agreement between the Company and Sequential was entered into for the lone purpose of artificially inflating the Company's financials; (6) the Company acquired Intralinks and misrepresented its future growth metrics to mask the Company's stagnation in the cloud computing business since 2015; (7) the newly-acquired Intralinks was underperforming and the Company was facing serious hurdles integrating, and capitalizing on, its newly acquired company; (8) senior management participated in artificially inflating revenues in order to meet projections and market expectations in violation of GAAP; (9) the Company prematurely recognized licensing revenues in the period the agreements were formed, instead of recognizing revenues ratably over the life of the agreements, in violation of GAAP; (10) as a result of the foregoing, the Company's guidance was overstated; and (11) the Company failed to maintain internal controls.

Such false and misleading statements and omissions allowed the Company to mislead investors as to the extent of the actual risk involved in investing in the Company. The Company in fact was a materially less-safe investment than Synchronoss led investors to believe.

By virtue of their leadership roles and the fact that these transactions concerned the core operations of the Company, the Officers and Directors at all relevant times knew or recklessly disregarded that the true state of Synchronoss's business, operations, and prospects was materially different from what the Company portrayed to the investing public. Indeed, the Officers and Directors signed-off on those very statements, in misleading securities filings, press releases, and proxy statements. These included the 2016 10-K (signed by all Officers and

Shareholder Demand on Synchronoss Technologies, Inc.'s Board of Directors
August 3, 2018
Page 7 of 9

Directors but Frederick), and 10-Qs (signed off by Waldis and Rosenberger), the 2016 Proxy Statement (approved by the entire Board), and various press releases and earnings calls during that time (involving Waldis and Rosenberger). In addition, the Officers and Directors failed to timely correct and/or caused the Company to fail to correct these false and/or misleading statements and/or omissions of material fact, further rendering them personally liable to the Company for breaching their fiduciary duties.

Even had they not participated in the misleading statements, Synchronoss's pervasive wrongdoing in the above-described schemes could not have escaped the notice of the Officers and Directors had they been appropriately discharging their fiduciary duties to the Company. In other words, even if the Officers and Directors had not intentionally and/or recklessly engaged in such wrongful acts, they consciously chose not to implement and maintain policies and procedures adequate and necessary to ensure such wrongful acts did not occur (i.e., adequate internal controls), in further breach of their fiduciary duties.

Separately, and independently, six of the Officers and Directors listed above engaged in lucrative insider sales and improperly benefitted themselves while the Company's stock was artificially inflated due to the false and misleading statements. While the price of the Company's stock was artificially inflated, Waldis sold 223,639 Company shares on inside information, from which he received nearly $7.7 million in proceeds. Rosenberger sold 32,172 Company shares on inside information, from which she received nearly $1.2 million in proceeds, and the majority of these sales occurred just prior to her resignation. Cadogan sold 30,000 Company shares on inside information, from which he received nearly $1.3 million in proceeds. Hopkins sold 27,500 Company shares on inside information, from which he received over $1.1 million in proceeds. McCormick sold 27,500 Company shares on inside information, from which he received $1.1 million in proceeds. Moore sold 22,000 Company shares on inside information, from which he received approximately $916,575 in proceeds. Thus, in total, six of the Officers and Directors sold 362,811 Company shares on inside information when the price of the shares was artificially inflated, from which they received over $13.3 million in proceeds.

Finally, and also independently, the Officers and Directors breached their fiduciary duties by causing the Company to repurchase its own stock at prices that were artificially inflated due to the false and misleading statements discussed herein. During the period these statements were made, the Officers and Directors caused the Company to repurchase at least 1,261,971 shares of its common stock at average per share prices ranging from $30.00 to $35.64. As the true value of the Company's common stock was $11.26, the price per share of the Company's common stock when the truth emerged, Synchronoss overpaid over $25.8 million for repurchases of its own stock.

The Company has been substantially damaged as a result of the Officers and Directors' breaches of fiduciary duty and other misconduct. These developments have plunged the Company into a period of chaos and uncertainty. Specifically, the aforementioned misconduct has subjected Synchronoss, Waldis, and Rosenberger to being named as defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the District of

Shareholder Demand on Synchronoss Technologies, Inc.'s Board of Directors
August 3, 2018
Page 8 of 9

New Jersey, captioned *In Re Synchronoss Technologies, Inc. Securities Litigation*, No. 3:17-cv-2978 (the "Securities Class Action").

As a direct and proximate result of the misconduct described herein, Synchronoss has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company and certain of Synchronoss's officers and directors for violations of federal and state laws, and amounts paid to outside lawyers, accountants, and investigators in connection with any internal investigations. Such expenditures also include losses incurred as a result of entering into related party transactions that were unfair to the Company, loss of valuable cash assets through the Company's inflated stock buy-backs, and costs associated with restating two years of financial statements. As a further direct and proximate result of the misconduct described herein, Synchronoss has suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future.

## II. DEMAND

Our client demands that the Board commence a civil action against each responsible individual to recover the above-referenced losses for the benefit of the Company, including, at least, by naming the Officers and Directors, and any other individuals or entities that engaged in the wrongdoing as set forth herein as defendants for their breaches of fiduciary duties, gross mismanagement, abuse of control, waste of assets, unjust enrichment, and violations of Sections 14(a), 10(b), and 20(a) of the Securities Exchange Act of 1934, as well as for the aiding and abetting of these breaches and violations. The Board must also assess whether any third parties should be sued, such as Synchronoss's financial advisors, auditors, or attorneys. Synchronoss must also adopt corporate governance improvements immediately that are designed to detect and deter future wrongdoing.

Please confirm receipt of this letter and the measures that you plan to take to address the harm inflicted upon Synchronoss as a result of the conduct described herein. If you have any questions, please do not hesitate to contact the undersigned counsel.

If, after the receipt of this letter, the Board has not commenced action as demanded within a reasonable period of time, we intend to initiate litigation on behalf of the Company. We are willing to assist the Board as it conducts the investigation and will review and comment upon all reports and information generated in the course of its work.

Shareholder Demand on Synchronoss Technologies, Inc.'s Board of Directors
August 3, 2018
Page 9 of 9

      Thank you for your attention to these matters.

           Very truly yours,

           Phillip Kim, Esq.

           -And-

           Timothy W. Brown
           The Brown Law Firm, P.C.
           240 Townsend Square
           Oyster Bay, NY 11771

# EXHIBIT D

## MORRIS, NICHOLS, ARSHT & TUNNELL LLP

1201 NORTH MARKET STREET
P.O. BOX 1347
WILMINGTON, DELAWARE 19899-1347

———

(302) 658-9200
(302) 658-3989 FAX

KENNETH J. NACHBAR
(302) 351-9294
(302) 425-3013 FAX
knachbar@mnat.com

July 9, 2019

Phillip Kim, Esquire
The Rosen Law Firm, P.A.
275 Madison Avenue, 34th Floor
New York, NY 10016

Re:    <u>Synchronoss Technologies, Inc. Stockholder Demand</u>

Dear Mr. Kim:

I write on behalf of the Board of Directors (the "Board") of Synchronoss Technologies, Inc. ("Synchronoss" or the "Company") in response to your August 3, 2018 letter to the Board (the "Demand"), written on behalf of your client, Patricia Thieffry. The Demand makes allegations that stem from the Company's restatement of its financial results for the fiscal years 2015 and 2016. Specifically, the Demand alleges that officers and directors of Synchronoss breached their fiduciary duties by disseminating materially false and misleading statements regarding the Company's financial results and prospects, as well as failing to disclose information related to: an alleged act of self-dealing in connection with the sale of Synchronoss' activation assets to Sequential, alleged underperformance of the newly-acquired IntraLinks, manipulation of the Company's financial results and violation of GAAP by management, and revenue recognition errors that caused the Company to overstate guidance. The Demand also alleges that the directors failed to timely correct those errors in the financial results, the officers and directors failed to ensure that the Company maintained internal controls, the officers and directors engaged in unlawful insider sales, and the directors caused the Company to overpay for stock in connection with a stock repurchase program while the Company's shares were artificially inflated.

After receiving your letter, the Board appointed a Demand Review Committee (the "Committee"), consisting of two disinterested and independent directors, William Cadogan and Kristin Rinne, to consider the Demand and to recommend action to the Board in response to that letter. The Committee was charged with reviewing, investigating and providing recommendations to the Board about how the Company should proceed with respect to the Demand and the claims and allegations asserted therein. The Committee was given full authority to retain and pay, at the Company's expense, independent legal counsel and other advisors as the Committee deemed necessary or appropriate to perform its duties. Finally, the officers,

Phillip Kim, Esq.
July 9, 2019
Page 2

employees and agents of the Company were directed to cooperate fully with the Committee and its advisors.

The Committee hired my law firm, Morris, Nichols, Arsht & Tunnell LLP ("Morris Nichols"), to assist it in considering the Demand and formulating a recommendation in response to it. After conducting an extensive investigation into the matters raised in the Demand, the Committee, following careful deliberation and for the reasons summarized below, determined in its business judgment to recommend to the Board that it would not be in the best interests of the Company and its stockholders to pursue any litigation in response to the Demand.

The Committee presented its findings and recommendations to the Board at a meeting on June 26, 2019. After discussion and careful consideration, the Board exercised its business judgment and accepted all of the Committee's findings and recommendation not to pursue litigation for any of the concerns raised in your Demand. The Committee also recommended that the Board direct the Compensation Committee to review the Company's insider trading policies, which have been in effect since 2006, and make any recommendations to the Board for any revisions that the Compensation Committee deemed appropriate. At the June 26 meeting, the Board adopted resolutions memorializing that decision.

<u>The Investigation</u>

With the assistance of Morris Nichols, the Committee investigated both the factual and legal issues raised in the Demand. The investigation included the review of, among other things, over 300 public and non-public documents, totaling well over 4,000 pages, including board and audit committee minutes and materials, SEC filings, communications with NASDAQ, press releases and investor call transcripts, employment agreements, 10b5-1 plans of officers and directors and information related to the Company's prior investigation and review of the financial errors. In addition, the Committee conducted interviews of in-house and outside counsel.

As part of the investigation, the Committee, assisted by its independent counsel: reviewed the information and made factual findings, reviewed and tested the investigation that had been conducted previously that led to the restatement of the Company's financial results, researched and reviewed the law applicable to each of the claims in the Demand and analyzed that law in connection with the factual findings, evaluated the potential downsides to litigation, including defenses, and identified possible responses to the Demand. Throughout the investigation, the Committee was apprised of its duties in responding to the Demand, advised of the range of potential responses to the Demand, and provided with updates on the progress and results of the investigation.

Phillip Kim, Esq.
July 9, 2019
Page 3

On May 29, 2019, the Committee met with its counsel to discuss the results of the investigation into the matters raised in the Demand.[1]  The Committee reviewed certain key factual findings, including, among others:

- The Company's reaction and response upon learning that its financial results may have contained accounting errors causing the results to be misstated, including hiring outside special counsel and forensic accounting consultants to identify the errors and their sources and to assist in correcting them as soon as practicable;

- The findings of the extensive and thorough prior investigation to identify the accounting errors and their sources performed by the Audit Committee and outside special counsel and forensic accounting consultants, including that no member of management was involved in misconduct and that there was no evidence that either management or the directors knew that the Company's financial results were misstated when they had been disclosed;

- The Audit Committee's work to oversee and monitor the Company's internal controls, including by engaging both the Company's auditors and another outside consultant to test and opine on the adequacy of the controls, and the fact that those advisors regularly provided updates of their work to the Audit Committee and did not identify any material weaknesses prior to the discovery of the accounting errors;

- The IntraLinks integration was in the early stages in the first quarter of 2017, the last quarter reported prior to the Company restating its financials, and the Company sold IntraLinks in December 2017 for approximately $96 million more than it had purchased IntraLinks in January 2017;

- The sales of stock by officers and directors during the relevant period were in accordance with 10b5-1 plans, approved by the Company, that the officers and directors had entered into for the sale of Company stock at a time when there is no evidence the officers or directors were aware that the financial results were misstated or were in possession of adverse material non-public information about the Company.  And, other sales of stock by officers had been pre-arranged to cover the withholding taxes the Company was required to pay on the vesting of restricted stock units granted over a three-year period;

- The evidence that no officer or director of Synchronoss had any ownership interest in any party related to the entity that acquired the Company's activation assets at the time of the transaction or at any time since May 2006,

---

[1]   Before making its recommendation, the Committee met two additional times to further discuss the matters raised in the Demand and had further communications with its counsel about the conclusions and recommendations it had reached.

Phillip Kim, Esq.
July 9, 2019
Page 4

when those persons sold their interests in Rumson Hitters, and the fact that the Company had received a fairness opinion related to the sale of those asset; and

- The Board's lack of knowledge that errors in the Company's financial results had occurred coupled with the deliberative process the Board undertook to determine to institute a stock repurchase program to deploy cash.

The Board also considered the actions the Company had already taken to remediate the prior accounting errors and to attempt to avoid similar issues in the future, including that the Company: (i) worked with its special counsel, forensic accounting consultants and auditors to correct and issue restated financial information as soon as practicable while working to ensure that the errors were all identified, (ii) fired four non-officer employees for actions related to the accounting errors, (iii) has hired a new consultant to assist the Company in resolving the material weakness in internal control over financial reporting, and (iv) has a new CEO and CFO, as well as other employees with responsibilities related to revenue recognition, and has realigned certain responsibilities of the management team.

<u>The Committee's Recommendations and the Board's Actions</u>

Based on its investigation and the facts above, as well as others, and giving consideration of the relevant law with respect to each of the issues raised in the Demand, the Committee determined that it would not be in the best interests of the Company to pursue claims related to the conduct described in the Demand, which was factually inaccurate with respect to the allegations of wrongdoing and lacked merit.

The Committee also recommended that the Board direct the Compensation Committee to review the Company's insider trading policies, which have been in effect since 2006, and make any recommendations to the Board for any revisions that the Compensation Committee deemed appropriate.

As noted above, the Board met on June 26, 2019 to consider the Committee's recommendations regarding the Demand. During that meeting, counsel reviewed for the Board the Committee's deliberations and discussions with respect to the Demand, the legal and factual bases for the Committee's recommendations, and the potential costs and practical considerations related to the Company pursuing litigation. Following questions and further discussion among the directors, the Board unanimously accepted the Committee's recommendations as in the best interests of the Company and its stockholders and instructed me to send this letter to you.

Sincerely,

Kenneth J. Nachbar

# EXHIBIT E

# The Rosen Law Firm
### INVESTOR COUNSEL

October 2, 2019

Phillip Kim
pkim@rosenlegal.com

**VIA EMAIL AND FEDEX**

Kenneth J. Nachbar, Esq.
Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19899-1347

**Re:   Shareholder Demand on Synchronoss Technologies, Inc.'s Board of Directors**

Dear Mr. Nachbar:

We represent Patricia Thieffry, who owns 100 shares of common stock of Synchronoss Technologies, Inc. ("Synchronoss" or the "Company") and has continuously owned them since September 2014. We have received and considered your July 9, 2019 letter rejecting Ms. Thieffry's demand (the "Demand") and have determined that your description of the Demand Review Committee's investigation is not detailed enough for us to evaluate whether it properly investigated the Demand.

To determine whether the Demand Review Committee's investigation was sufficient, we need the following additional information:

1) An explanation of how the Board selected the members of the Demand Review Committee and what investigation was done to determine that they could act independently. In particular, please explain how the Board determined that William Cadogan could act disinterestedly and independently given that he's been a member of the Board since 2005 and is one of the people that the Demand asked the Board to take action against.

2) Copies of the approximately 300 documents reviewed by the Demand Committee and an explanation of how those documents were selected.

3) A list of the people interviewed for what the letter describes as "the investigation that had been conducted previously that led to the restatement of the Company's financial results" (the "Prior Investigation").

4) A list of the materials from the Prior Investigation that the Demand Committee reviewed, including a list of all the interviews (if any) they reviewed.

Shareholder Demand on Synchronoss Technologies, Inc.'s Board of Directors
October 2, 2019
Page 2 of 2

    5)  Copies of any reports of investigatory findings produced by the Demand Committee or that were produced during the Prior Investigation.

    6)  An explanation of how the Demand Committee determined that the Board lacked "knowledge that errors in the Company's financial results had occurred."

As we stated in the Demand, we are happy to answer any questions and are willing to assist the Board in any way that would be helpful. Thank you for your attention to these matters.

Very truly yours,

Phil Kim / BBA
_____
Phillip Kim, Esq.

-And-

Timothy Brown, Esq.
The Brown Law Firm, P.C.
240 Townsend Square
Oyster Bay, NY 11771

# EXHIBIT F

# Morris, Nichols, Arsht & Tunnell LLP

1201 NORTH MARKET STREET
P.O. BOX 1347
WILMINGTON, DELAWARE 19899-1347

(302) 658-9200
(302) 658-3989 FAX

KENNETH J. NACHBAR
(302) 351-9294
(302) 425-3013 FAX
knachbar@mnat.com

October 31, 2019

**BY EMAIL AND REGULAR MAIL**

Phillip Kim, Esquire
The Rosen Law Firm, P.A.
275 Madison Avenue
40th Floor
New York, NY 10016

Re:   Shareholder Demand on Synchronoss Technologies, Inc.'s Board of
Directors by Patricia Thieffry

Dear Mr. Kim:

We have received your letter dated October 2, 2019 requesting certain documents on behalf of Patricia Thieffry. We do not believe that your request for documents is proper, and the request is therefore denied.

Very truly yours,

Kenneth J. Nachbar

KJN/kd